JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

TYLER M. ALEXANDER (CA 313188)
JENNIFER A. NAJJAR (CO 50494)
EMMA L. HAMILTON (CA 325360)
Trial Attorneys
Natural Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NEIGHBORS AGAINST BISON SLAUGHTER, *et al.*, | ) ) ) | Case No. 1:19-cv-3144-BAH |
| Plaintiffs; | ) ) ) | **OPPOSITION TO PLAINITFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | ) ) | |
| THE NATIONAL PARK SERVICE, *et al.*, | ) ) | |
| Defendants. | ) ) | Administrative Procedure Act Case, 5 U.S.C. §§ 701 *et seq.* |
| _____ | ) | |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

    I.      The Interagency Bison Management Plan ("IBMP") ............................................. 3

           A.      Development of the IBMP ............................................................. 4

           B.      IBMP Partner Roles ..................................................................... 5

           C.      Bison Hunting in the Northern Management Area ....................................... 7

STATUTORY STANDARDS ............................................................................................. 11

    I.      APA ................................................................................................................. 11

    II.     NEPA ............................................................................................................. 12

STANDARD OF REVIEW ............................................................................................... 12

ARGUMENT ................................................................................................................. 13

    I.      Plaintiffs Have No Likelihood of Success on the Merits .................................... 13

           A.      Plaintiffs Have No Likelihood of Success on their Argument that "The Forest Service Unreasonably Regulated the Land Congress Assigned it to Regulate ............................................................. 13

           B.      Plaintiffs Have No Likelihood of Success on their Argument that "The Park Service Can Control the Bison Hunting in Beattie Gulch," Let Alone that It Must. ................................................................ 19

           C.      The Agencies Analyzed the Impacts of Bison Management in the IBMP EIS, and Plaintiffs' Challenge to that Analysis is Time Barred ..... 24

           D.      There Are No Significant Changes to the IBMP or Significant New Circumstances Requiring a Supplemental EIS ......................................... 28

    II.     Plaintiffs Fail to Show Irreparable Harm ...................................................... 32

           A.      Plaintiffs' Alleged ................................................................. 33

                 i.      Plaintiffs' Alleged "Increased-Risk-of-Harm" Injuries are Insubstantial and Improbable. ................................................. 33

                 ii.     Plaintiffs' Alleged Aesthetic Injuries Do Not Establish a Clear and Present Need for Equitable Relief ................................. 36

III.     Plaintiffs' delay counsels against a finding of irreparable harm........................... 38

IV.     The Balance of Equities and Public Interest Counsel Against an Injunction ....... 39

CONCLUSION ........................................................................................................................ 42

**EXHIBIT INDEX**

| Exhibit | Name |
|:---:|:---|
| 1 | Declaration of Timothy C. Reid, National Park Service Bison Program Coordinator |
| 2 | Memorandum of Agreement Between the Confederated Salish and Kootenai Tribes, the Confederated Tribes of the Umatilla Indian Reservation, the Nez Perce Tribe, and the Confederated Tribes and Bands of the Yakama Nation for Coordination of Bison Harvest in Beattie Gulch, Gardiner, Montana (October 24, 2017) |
| 3 | Declaration of Mary Erickson, Custer Gallatin National Forest Supervisor |
| 4 | 2019 Montana Bison Hunting Regulations, Mont. Dep't of Fish, Wildlife, and Parks |
| 5 | 2008 Adaptive Adjustments to the IBMP (December 17, 2008) |
| 6 | 2013 Area Closure Notice, Gallatin National Forest |
| 7 | 2016 Forest Order, Custer Gallatin National Forest |
| 8 | 2018 Forest Order, Custer Gallatin National Forest |

# INTRODUCTION

Plaintiffs' Complaint and emergency motion take aim at operating instructions issued nearly one year ago that provide guidance to various State of Montana agencies, Indian tribes, and federal agencies on how to implement an annual harvest of Yellowstone bison. The harvest occurs on federal land each winter, when the herd naturally migrates from Yellowstone National Park to an area of the Gallatin National Forest.  The harvest is one tool used each year by the tribes and state and federal agencies to implement a bison management plan that was the product of intensive collaboration, environmental analysis, and public participation.  The planning and coordination among these different sovereigns to manage the Yellowstone bison, a species that is important and iconic (including to the affected tribes) – yet which also carries the risk of disease transmission and damage to both natural resources on federal lands and private property if its numbers and movements are not carefully controlled – comports with the constitution's scheme of cooperative federalism for management of wildlife on federal lands but subject to the State's police power and the Tribes' treaty rights.

Plaintiffs cite generic organic statutes and a narrow provision of the Yellowstone Management Act addressing the "dispos[al] of surplus" bison to argue that the Plan has improperly assigned regulatory authority over Beattie Gulch bison hunting to the State, and seek an injunction of the hunt – an activity that does not rely on any federal agency action for its authorization – as preliminary relief.  But the language of the authorities Plaintiffs cite does not carry the weight Plaintiffs would have the Court give it.  Plaintiffs' claims brought under NEPA are also unlikely to succeed, since they fail to meet the regulatory threshold that would require the agency to supplement the analysis that occurred in connection with the original plan. Moreover, Plaintiffs' decisions to bring their lawsuit in a forum unconnected to the relevant

events, parties, and resources, and in an emergency posture despite the fact that the most recent

action identified occurred almost a year ago (and that the hunting has been occurring annually

for more than a decade), counsel against any award of emergency relief by this Court.  As

Defendants demonstrate below, Plaintiffs meet none of the four factors they must satisfy to

justify the "extraordinary remedy" of an injunction, and their motion should either be transferred

without decision to the District of Montana, or simply denied.

## BACKGROUND

The American bison is an indelible symbol of the west—a critical resource that

historically provided food, clothing, fuel, tools, and shelter to Plains tribes and settlers alike.

Pls.' Mot. for a TRO and a Prelim. Inj., P. & A. in Supp. ("Pls.' Br."), Ex. B (*IBMP EIS*), 362-

63.  Today, bison remain an essential component of the Greater Yellowstone ecosystem, which

spans millions of acres across parts of Idaho, Montana and Wyoming.  But modern land and

resource management interests also require that the native bison population be carefully managed

to maintain healthy ecosystems and rangelands and protect valuable livestock interests.

Yellowstone National Park provides a sanctuary for a wild and free ranging population of

bison up to a certain limit.  IBMP EIS, i.  The Park, however, is not a self-contained ecosystem,

and bison often migrate off the Park in winter in search of food, where they may interface with

private property and cattle.  IBMP EIS, i; *see* Pls.' Br.", Ex. H, ECF No. 4-16, 4-5 (*IBMP Record

of Decision ("ROD")*).  In recent history, bison have been known to carry brucellosis,[1] a disease

that can pass from migrating bison to livestock.  Federal and State agencies have long sought to

---

[1] Brucellosis is a disease caused by the bacteria *Brucella abortus* that can cause abortions, still
births, and premature live births in infected bison, elk, and cattle.  IBMP EIS, ix-x; xliv-xlv.  In
humans, brucellosis manifests as undulant fever.  *Id.*

maintain a robust, free-ranging wild bison population while balancing the need to protect other resource values within the Park and on public lands and while limiting the risk of disease transfer. *Id.*

## I.     The Interagency Bison Management Plan ("IBMP")

The long-term management of bison has been complicated by several interrelated factors: (1) Yellowstone National Park and the state and federal lands outside the park have a limited land base and resource tolerance to support free-ranging bison; (2) bison roam across different jurisdictions managed by different state and federal agencies; and (3) those state and federal agencies have different goals and responsibilities as they relate to the bison.  IBMP ROD 4-5; Declaration of Timothy C. Reid ("Reid Decl.")  ¶ 6 (attached here as Ex. 1).  Both state and federal entities have recognized that:

> [w]hen bison leave Yellowstone National Park and enter Montana, the management responsibilities and authorities change. Within the boundaries of Yellowstone National Park, the Secretary of the Interior has exclusive jurisdiction to manage the park's natural resources, including the bison.  Outside the park the State of Montana has the management authority over the bison.  When the bison are on national forest system lands, the U.S. Forest Service has responsibilities under federal laws to provide habitat for the bison, a native species.  Federal law requires APHIS to control and prevent the spread of communicable and contagious diseases of livestock.  Because of these mandates,…a coordinated, cooperative management regime . . .  provide[s] consistency and reliability to the process.

IBMP ROD, 6.  Moreover, several Indian tribes have treaty-based hunting rights that include the right to hunt bison on certain lands outside the Park.  Hunters from the authorized treaty tribes and a smaller number of state hunters—permitted by their responsible tribal and state entities respectively—participate in an annual bison hunt on state and National Forest System land near the Park.  Pls.' Motion for a TRO and a Prelim. Inj., P. & A. in Supp., Ex. D, ECF No. 4-12 at 6

("*2019 Winter Plan*").  Each sovereign[2] manages and administers its own hunting regulations,

permitting systems, and safety agreements, and each enforces regulations for hunters under their

jurisdiction by sending game wardens to the hunting areas.  *See, e.g.*, 2017 Tribal Memorandum

of Agreement (Ex. 1); 2019 State of Montana Bison Hunting Regulations (Ex. 4); Pls.' Br. Ex. C

("*2018 State Letter*").  The Forest Service and Park Service do not have authority to regulate

bison hunting beyond Yellowstone's borders.  Reid Decl. ¶ 4; Declaration of Mary C. Erickson

("Erickson Decl.") ¶ 4 (attached here as Ex. 3).

### A.  Development of the IBMP

After decades of planning and negotiations over how to best coordinate bison

management in the Yellowstone area, the Interagency Bison Management Plan ("IBMP") was

adopted in 2000.  Its original members were the Park Service, Forest Service, U.S. Department

of Agriculture's Animal and Plant Health Inspection Service, Montana Department of Livestock,

and Montana Department of Fish Wildlife, and Parks.  The federal agencies published a Final

Environmental Impact Statement ("FEIS") analyzing the environmental impacts of the IBMP

and a Record of Decision ("ROD") adopting the IBMP.[3]  IBMP ROD, 6.  Since then, the IBMP

Partners have issued annual updates and operations plans to respond to changing management

conditions.  *See* 2008 IBMP Adaptive Management Plan (Ex. 5).  The IBMP is explicit,

however, that the annual operations plans and related changes "will be applied within the

---

[2]        The Confederated Salish and Kootenai Tribes, Nez Perce Tribe, Shoshone-Bannock
Tribes, Confederated Tribes of the Umatilla Reservations, Confederated Tribes and Bands of the
Yakama Nation, and Blackfeet Nation have reserved aboriginal hunting rights on open and
unclaimed lands within the State of Montana.  Each tribe has its own regulations governing its
bison hunt.  The State of Montana regulates hunting for state hunters.  As discussed *infra*, the
federal agencies named in this action have no role in permitting or regulating hunting.
[3]        The State of Montana also compiled a state EIS and issued a state ROD adopting the IBMP,
which incorporated the federal FEIS and federal ROD.  *See* Pls.' Br. Ex. L ECF 4-20, 20.

framework of the existing IBMP and will not alter the basic management direction or goals of the original plan." *Id.* at 1.

The IBMP ROD prescribes this form of adaptive management to accomplish its principal goal of maintaining a free-ranging population of wild bison and preventing the transmission of brucellosis. *See* IBMP ROD, 32 ("Implementation of management actions by the agencies will be conducted in accordance with this Plan and any memorandum of understanding and/or procedure agreements developed by the agencies, which may provide agency personnel with flexibility to achieve the objectives of the actions set forth in this plan."). The process thus provides the opportunity for IBMP partners to modify elements of the plan based on new research and changing conditions, so long as these changes remain within the scope of actions contemplated in the FEIS and ROD. IBMP ROD, 32. Through adaptive management changes, the IBMP partners have increased tolerance for bison outside the Park to promote healthy population numbers in the herd. *See, e.g.*, *2016 IBMP Adaptive Management Plan*, 3; Reid Decl. ¶ 6.

### B.  IBMP Partner Roles

While the IBMP provides the framework for coordination and cooperation between federal, State, and tribal governments, it does not alter or enlarge the jurisdiction of any of its signatories. Rather, the IBMP directs its partners to coordinate to best manage bison in the region as an exercise of cooperative federalism. *See Kleppe v. New Mexico*, 426 U.S. 529, 545-46 (1976); *Defs. of Wildlife v. Andrus*, 627 F.2d 1238, 1248 (D.C. Cir. 1980); *Wyoming v. United States*, 279 F.3d 1214, 1226 (10th Cir. 2002) ("Historically, States have possessed broad trustee and police powers over the wildlife within their borders, including wildlife found on Federal lands within a State.") (citations and internal alterations omitted)).

The IBMP acknowledges that the Park Service has exclusive jurisdiction over bison management actions within the boundaries of Yellowstone National Park.  IBMP ROD, 6.  The "Park Service develops an annual Population Status Report that contains a recommendation to the IBMP partners for the number of animals to be removed from the bison population to balance anticipated population growth with available tolerance land base."  Reid Decl. ¶ 6.  This recommendation, which is incorporated into the Annual Winter Operations Plan, is "developed by National Park Service biologists" using population models based on studies of the herd within Park boundaries throughout the summer.  *Id.*  Bison may be removed from the population in various ways, including Park Service capture and removal to approved slaughter facilities.  *Id.* ¶ 7.  State-regulated public bison hunting outside the Park is another population control tool, one which the IBMP recognizes as a desirable option for managing the population and distribution of Yellowstone bison under appropriate conditions.[4]  *See* Pls.' Br. Ex. L, ECF 4-18 at 3 (*"Montana Hunting EA"*) (citing IBMP EIS).  As bison exit the Park, wildlife management authority shifts from the Park Service to the State of Montana.  *See 2019 Winter Plan* 11.

Montana Fish, Wildlife and Parks administers state-regulated public hunting outside the Park, including on Forest System lands.  *See* IBMP ROD, 15; *see also* Erickson Decl. ¶ 4 ("NFS lands are generally open to hunting and recreational shooting.").  Fish, Wildlife, and Parks has direct authority to enforce hunting regulations outside Yellowstone National Park and the direct authority to close hunting areas to state licensees.  *See, e.g.*, *2018 State Letter*.  Indeed, in recent years the State has proposed hunting closures "to address hunter safety issues."  *See id.*; *see also* Pls.' Br. Ex. V, ECF-19 (State enforcement memorandum listing various state regulations aimed at addressing concerns about the safety of hunters).  The Montana Department of Livestock

---

[4] Hunting is specifically prohibited inside of the Park by federal law. 16 U.S.C. § 26.

manages other bison-related issues, including disease prevention and control, outside of the Park. *2019 Winter Plan* 11.

The IBMP recognizes that the Forest Service's main responsibility with respect to bison under the Gallatin National Forest Plan and statutory authority is to maintain bison habitat. IBMP ROD, 14.  The Forest Service's interest in bison management is to "insure appropriate stewardship of National Forest lands" and "recognize and support the exercise of tribal treaty rights while addressing basic safety and resource protection needs."  Erickson Decl. ¶ 3.

To help coordinate these various roles and effectively implement adaptive changes to the IBMP each year, the IBMP partners draft and publish annual Winter Operations Plans. *2019 Winter Plan* 14.  Winter Operations Plans contain updated information about bison tolerance zones, hunting safety protocols, and various methods and levels of bison harvesting that will be implemented in the upcoming year.  *See generally id.*  Updated Winter Operations Plans require the signature of all the IBMP Partners and must be published online by December 31.  But if the Partners fail to reach a consensus and approve a new plan, the most-recent Winter Operations Plan will remain in effect until replaced by subsequent updates.  *Partner Protocols* 5.  These "annual operations plans, including the 2019 Winter Plan, serve as implementation and coordination agreements between the agencies" but do "not authorize or permit bison hunting." *Erickson Decl.* ¶ 8.

### C.  Bison Hunting in the Northern Management Area

State-regulated bison hunting has been taking place on state and federal lands outside Yellowstone National Park for nearly 15 years.  The Montana State EIS and ROD adopting the IBMP incorporated the federal FEIS by reference and contemplated that the Environmental Assessment process would be used to consider introducing public hunting as a population

management tool in the event the State Legislature authorized bison hunting in Montana. *Montana Hunting EA* at 4-5.[5]  In 2004, the Legislature did so.  *Id.* at 5; *see also* MONT. CODE. ANN. §§ 87-1-216(2)(c) (Wild Buffalo or bison as species in need of management – policy – department duties) and 87-2-730 (Special Wild Buffalo License – Regulation).  Following state authorization, Fish, Wildlife, and Parks prepared an environmental assessment and issued a 2005 decision notice allowing hunting by permit on certain public and private lands. Pls.' Br. Ex. P, ECF. 4-24 at 26-27*; see also* Pls.' Br. Ex. E, ECF-13 at 5 ("*2011 Adaptive Change Memo*"). Since 2005, state and tribal hunters have been participating in winter bison hunts on Custer Gallatin National Forest land. *See* Pls.' Ex. F, ECF-14 at 18.

The IBMP divides bison management into in a western management area and a northern management area, and further divides each into numbered zones with various bison management schemes based on the unique characteristics of each area.  *See* IBMP ROD, 29-30. Beattie Gulch, at issue in this case, falls within Zone 2 in the larger northern management area.  *See Tribal MOA* at 9-10 (illustrating Beattie Gulch area). Separately, Montana Fish, Wildlife, and Parks, manages bison *hunting* by district, and Beattie Gulch falls within the broader Gardiner Hunting District 385.  *See 2018 State Letter*.

These spatial distinctions are important because Plaintiffs' claims center on Beattie Gulch and their motion for emergency relief ties hunting statistics derived from the broader Gardiner Hunting District as solely attributable to the much smaller Beattie Gulch area. *Compare* Pl's Br. at 13 (citing a 2017 Status Report on the Yellowstone Bison Population for the assertion that during the 2016-2017 winter hunting season "hunters had killed 389 bison in Beattie Gulch")

---

[5] Bison hunting had previously been authorized by the State of Montana through the 1980s and into the early 1970s.  IBMP EIS, 303.

*with* Pls.' Br. Ex. F, ECF-14 at 8, 9 (the actual report Plaintiffs' cite, which appears to show that 389 bison were harvested that year in the IBMP's entire northern management area).  The IBMP's 2018 Annual Report shows that during the 2017-2018 hunting season, 279 bison were harvested throughout the Gardiner Hunting District. 2018 IBMP Annual Report 10.

The IBMP partners are committed to ensuring that all bison management activities in the northern management area, including public hunting, are conducted safely.  And the IBMP partner agencies have worked diligently to this end within the framework of each entity's jurisdiction and authority.  For example, in 2013, the Forest Service issued a permanent shooting closure for a portion of Beattie Gulch bordering the Yellowstone River.  Erickson Decl. ¶ 5; *see also* 2013 Closure Order (Ex.6).  In 2015, after working closely with private property owners and hunting tribes to identify solutions to neighboring landowners' concerns, the IBMP Partners agreed to respect a 150-yard buffer above the county road inside of which there would be no shooting and no bison remains left behind.  Erickson Decl. ¶ 5.  In December 2016, the Forest Service issued a shooting closure making this buffer zone—now referred to as the "Clean Zone"—an official and enforceable "no shooting" area.  2016 Closure Order (Ex. 7).  The "Clean Zone" closure is renewed each year to promote safety and minimize conflict between hunters and landowners.  *See* 2018 Closure Order (Ex. 8).  Similarly, in response to concerns of traffic congestion and bison remains along the county road, in 2015 the Forest Service opened a federal administrative road in Beattie Gulch to allow hunters to retrieve bison without overburdening the public road.  *See* Erickson Decl. ¶ 5.

The State of Montana—the IBMP partner agency with regulatory and enforcement authority to actually manage hunting—has also been working for years to ensure that the hunt is safe for all participants. *See* Pls.' Br. Ex. V, ECF-19 ("[T]he State of Montana intends to enforce

all safety-focused state law and regulations upon all hunters in both the Gardiner and West

Yellowstone basins while hunters are present for hunting bison.").  On National Forest System

land within Montana, the state is the entity empowered to regulate—or forbid—bison hunting,

and the state exercises this authority when necessary.  *See 2018 Letter*.  The state has recognized

that hunting presents safety concerns for hunters, but has not opined on risks to property owners,

neighbors, or visitors not participating in the hunt.  *See* Ex. V at 1.

Tribal entities have also collaborated to ensure safe hunting conditions.  In 2017, four

federally recognized tribes with treaty-reserved rights to hunt in the Yellowstone region[6] entered

into a Memorandum of Agreement ("2017 Tribal MOA") to "support the Parties' efforts to

maintain a regular, predictable, safe, and respectful bison hunt in Beattie Gulch, Gardiner,

Montana."  2017 Tribal MOA 1.  Through the MOA, the tribes "seek to accomplish this purpose

by specifying mutually agreeable hunt protocols for Beattie Gulch, as well as the common safety

regulations and provisions they intend to prioritize for enforcement . . . ."  *Id.*[7]  The tribes have

thus adopted common bison hunt protocols for the Beattie Gulch area, from limiting the number

of total hunters who can be in Beattie Gulch at a given time to designating a "lead hunter" from

that group to ensure that all hunters follow the detailed hunt protocols and safety regulations.

Tribal MOA at 7. Safety protocols include determining "a safe approach strategy and shooting

direction" and "[c]oordinat[ing] with other hunters to determine a safe, orderly, and fair order of

---

[6] The four parties to the 2017 MOA are the Confederated Salish and Kootenai Tribes, the
Confederated Tribes of the Umatilla Indian Reservation, the Nez Perce Tribe, and the
Confederated Tribes and Bands of the Yakama Nation. These four tribes conduct the highest
volume of treaty hunting in the region, and other hunting tribes are encouraged to abide by its
safety protocols. *See* MOA; Tim's Comments.

[7] The MOA also discusses how "[w]hile each Tribe has the inherent right to independently set its
own season, harvest regulations, and enforcement mechanisms, the congested nature of Beattie
Gulch necessitates close coordination between the Parties to ensure the safety of hunters,
enforcement officers, and the surrounding community."  Tribal MOA 1.

fire and harvest to minimize herd disturbance, stampeding, wounding loss, and hunter conflict, taking into account changing conditions on the ground." 2017 MOA at 7.  Each tribal signatory to the MOA has agreed to "have law enforcement at Beattie Gulch anytime it has a permitted hunter or hunters in Beattie Gulch." 2017 MOA at 8.

## STATUTORY STANDARDS

### I.   APA

Because NEPA does not provide a cause of action, this Court's review of Plaintiffs' claims is circumscribed by the highly deferential standard found in the APA.  5 U.S.C. §§ 702, 704; *Karst Envtl. Educ. and Prot., Inc. v. EPA,* 475 F.3d 1291, 1297 (D.C. Cir. 2007). The APA provides two causes of action: (1) claims to "compel agency action unlawfully withheld or unreasonably delayed" and (2) claims that a discrete, final agency action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"  5 U.S.C. § 706.  As to § 706(1), a court may only compel agency action "legally *required.*" *Norton v. So. Utah Wilderness All.,* 542 U.S. 55, 63-64 (2004); *accord Anglers Conservations Network v. Pritzker,* 809 F.3d 664, 670 (D.C. Cir. 2016) (explaining that § 706(1) grants judicial review only if a federal agency has a 'ministerial or non-discretionary' duty amounting to a 'specific, unequivocal command.'" (quoting *Norton,* 542 U.S. at 63-64.)

As to § 706(2), the question is not whether the Court itself would have made the same decision, because "the court is not empowered to substitute its judgment for that of the agency." *Citizens to Pres. Overton Park v. Volpe,* 401 U.S. 402, 415-16 (1971) (citations omitted). Rather, the Court must uphold the decision if the agency followed required procedures, evaluated relevant factors, and reached a reasoned decision that did not constitute a clear error of judgment or exceed the bounds of its statutory authority.  *Id.*  It is the plaintiff's burden to prove that these

criteria are not met and that the agency's decision was arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

## II.   NEPA

The National Environmental Policy Act ("NEPA") is a procedural statute that requires federal agencies to consider the impacts of, and alternatives to, federal actions significantly affecting the environment.  42 U.S.C. §§ 4321, 4331.  Its purpose is to ensure that federal agencies take a "hard look" at the environmental consequences of their proposed actions before deciding to proceed.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51 (1989).  Although NEPA establishes procedures by which agencies must consider the environmental impacts of their actions, it does not dictate substantive results.  *Id.* at 350.

Postdecision, supplemental NEPA analysis is appropriate where either: (1) the agency has substantially changed the action from that analyzed in an earlier NEPA document or (2) substantially new information has come to light bearing on environmental concerns. 40 C.F.R. § 1502.9.  Case law, however, "make[s] clear that an agency need not supplement an EIS every time new information comes to light after the EIS is finalized, Marsh v. Or. Natl. Res. Council, 490 U.S. 360, 373 (1989), but instead only where "there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered."  Id. at 374 (citation omitted).

## STANDARD OF REVIEW

A preliminary injunction is an extraordinary and drastic remedy, never available as of right.  *Munaf v. Green*, 553 U.S. 674, 689 (2008) (citation omitted); *see also Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).  "As an extraordinary remedy, courts should grant such relief sparingly," *Konarski v. Donovan*, 763 F. Supp. 2d 128, 133 (D.D.C. 2011), and "the party

seeking injunctive relief bears a substantial burden to show that the party is entitled to such an extraordinary remedy." *Competitive Enters. Inst. v. U.S. Dep't of Agric.*, 954 F. Supp. 265, 269 (D.D.C. 1996); *see also Am. Coastal Line Joint Venture, Inc. v. U.S. Lines, Inc.*, 580 F. Supp. 932, 935 (D.D.C. 1983); *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1208 (D.C. Cir. 1989).

This circuit applies the traditional four-part test for issuing a preliminary injunction. A party seeking injunctive relief pursuant to a motion for a preliminary injunction must show: (1) a substantial likelihood of success on the merits; (2) that he would suffer irreparable injury if the injunction were not granted; (3) that the balance of the equities tips in his favor; and (4) that the public interest would be furthered by the injunction. *Winter*, 555 U.S. at 10; *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The movant has the burden to show that all four factors are satisfied by clear and convincing evidence. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009). A preliminary injunction is inappropriate where Plaintiffs have sat on their rights; "such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (quoting Newdow v. Bush, 355 F. Supp. 2d 265, 292 (D.D.C. 2005).

## ARGUMENT

### I.     Plaintiffs Have No Likelihood of Success on the Merits.

Plaintiffs enjoy no likelihood of success on the merits. Each of Plaintiffs arguments either fails to state a claim, or else fails entirely under the relevant statutory standards.

####     A.     Plaintiffs Have No Likelihood of Success on their Argument that "The Forest Service Unreasonably Regulated the Land Congress Assigned it to Regulate."

Plaintiffs argue that the Forest Service has violated the APA by failing to adequately consider the impacts of hunting on Forest Service lands and by failing to explain why the Forest Service has closed some lands to hunting but not others.  Neither argument states a claim.  The Forest Service considered the impacts of bison management—including impacts related to one tool for that management (hunting)—on National Forest System lands in the 2000 IBMP EIS, and any challenge to that analysis is long-since time-barred.  Further, because Congress has chosen to leave National Forest System land open to hunting as a generally allowed use, and because the Forest Service thus has taken no final agency action to "approve" hunting on the Gallatin National Forest, the Forest Service was not required to conduct any additional analysis of the issue.  Nor is the Forest Service required to explain its lack of a decision to close other areas of the Forest; inaction is not reviewable under the "arbitrary and capricious" standard of 5 U.S.C. § 706(2), and a closure cannot be compelled under 5 U.S.C. § 706(1).  For these reasons, Plaintiffs' have no likelihood of success on these claims.

The Forest Service manages National Forest System lands under the principles of "multiple-use" and "sustained yield."  16 U.S.C. § 1604; 16 U.S.C. § 528; *see also Lands Council v. Powell*, 395 F.3d 1019, 1025 n.2 (9th Cir. 2005) ("The national forests, unlike national parks, are not wholly dedicated to recreational and environmental values." (citation omitted)); *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 448 (7th Cir. 1990) (same).  As required by the National Forest Management Act, the Gallatin National Forest Plan sets forth "[t]he management philosophy of the Gallatin Forest" and guides the Forest in managing competing demands for resources.  Gallatin National Forest Plan i.[8]  The forest is generally open to hunting;

---

[8] The Forest Plan requires that the Forest "[p]rovide a variety of hunting opportunities," *id.* at III-71, and recognizes that the current supply of big game hunting opportunities on the forest "falls

as the Forest Service website explains, "the rules are simple: Follow the state laws and regulations pertaining to hunting, including seasons, dates and licensing."  United States Forest Service, *Know Before You Go: Hunting*, https://www.fs.fed.us/visit/know-before-you-go/hunting (last visited Oct. 29, 2019).

Earlier this year, Congress—through the John D. Dingell, Jr. Conservation, Management, and Recreation Act ("Dingell Act")—reaffirmed that National Forest System land is generally open and available for hunting.  The Dingell Act provides in relevant part that "Federal land shall be open to hunting, fishing and recreational shooting, in accordance with applicable law," 16 U.S.C. § 7912(a), unless closed "for reasons of public safety, administration, or compliance with applicable laws."  *Id.* § 7913(a)(1).[9]  The law also requires that, in the event of a closure, the Forest Service "designate the smallest area for the least amount of time that is required," *id.* § 7913(a)(2), and follow a certain procedure.  *Id.* at § 7913(b).  The Forest Service retains discretion to close portions of the Forest to shooting and hunting when it determines those closures are necessary, 36 C.F.R. § 261.50(a) (2018) (describing closure authority with a permissive "may"), and the Forest has done so recently in response to health, safety, vehicle traffic, and aesthetic concerns regarding the bison hunt.  *See, e.g.*, 2018-2019 Closure Order; 2017-2018 Closure Order; Erickson Decl. ¶¶ 5-7.

Though Plaintiffs are plainly not satisfied with the extent of those closures, Plaintiffs cannot direct this Court to any authority supporting their arguments that the Forest Service was required to issue a more expansive enclosure.  None of the statutes or regulations to which

---

short of demand."  *Id.* at V-9, V-14.  For recreation activities, including hunting, the Forest Plan describes "closures" as a management tool "of last resort."  *Id.* at II-14.

[9] The Dingell Act does not apply to lands that were not open to hunting or other recreational shooting activities on March 12, 2019, and thus does not impact Yellowstone National Park.

Plaintiffs cite entitles them to the remedy they seek, or any remedy at all.  Pls.' Br. 18 (citing 16 U.S.C. § 551; 16 U.S.C. § 521a; 16 U.S.C. § 1609; 16 U.S.C. § 551a; 16 U.S.C. § 553; 36 C.F.R. § 261.53(e)).  Nor do Plaintiffs make any mention of—or make effort to grapple with—Congress' disfavor of closures as expressed most recently in the Dingell Act.  16 U.S.C. § 7913(a)(2).

Instead, Plaintiffs argue that the Forest Service was required to conduct more analysis of hunting and its impacts before "approving the hunting configuration in the 2019 Winter Plan." Pls.' Br. 19-20.  As a factual matter, although Forest Service "approval" is not required to hunt on National Forest System lands, the Forest Service did consider the impacts of bison management—including hunting as a management tool—in the IBMP EIS.[10]  *See, e.g.*, IBMP EIS, 49 (discussing the State of Montana's role in regulating hunting and historical bison hunting); *id.* at 294-95 (discussing hunting on the Gallatin National Forest as "a major recreational use"); *id.* at 303 (discussing the historical hunts of the mid-1980s and early 1990s); *id.* at 333 (discussing bison hunting, and "[h]unting in general . . . [as] a natural part of ecosystems, . . . a natural human activity[,] and may be 'an instinct after millions of years.'"); *id.* at 123-36 (discussing a proposed alternative where hunting is used as the primary management tool to maintain herd size); *id.* at 362-66 (discussing treaty hunting rights in the Yellowstone area and historical evidence of hunting by American Indiana tribes).  Further, and as a threshold matter, Plaintiffs cannot challenge the sufficiency of the analysis now, nearly twenty-years after it was completed.  *See Chenault v. McHugh*, 968 F. Supp. 2d 268, 272 (D.D.C. 2013) (explaining

---

[10] Plaintiffs repeatedly mischaracterize the IBMP ROD as "promis[ing]" additional NEPA analysis of the impacts on hunting.  The ROD actually states that the federal agencies "cannot opine as to the necessity of additional NEPA compliance to implement a public hunt as part of the Joint Management Plan."  IBMP ROD, 15.  Because the Forest Service is not taking any affirmative steps to "implement a public hunt," no additional NEPA analysis is due.

that actions seeking review of final agency actions are subject to a six-year statute of limitations that is "jurisdictional . . . and as such must be strictly construed.").

Finally, as a substantive matter, Plaintiffs' argument misunderstands the cooperative federalism scheme that governs wildlife management on National Forest System lands.  *See Kleppe*, 426 U.S. at 545-46 (recognizing that "the States have broad trustee and police powers over wild animals within their jurisdictions" where Congress has not restricted that power); *Wyoming*, 279 F.3d at 1226 ("Historically, States have possessed broad trustee and police powers over the wildlife within their borders, including wildlife found on Federal lands within a State.") (citations and internal alterations omitted); *Utah Native Plant Soc'y v. U.S. Forest Serv.*, No. 2:16-cv-56-PMW, 2017 WL 822098, at *4 (D. Utah, Mar. 2, 2017), *aff'd as modified*, 923 F.3d 860 (10th Cir. 2019) ("A hallmark of the Forest Service's federal land management duties is the Forest Service's obligation to work cooperatively with the states to balance the federal government's interest in land management with the state's traditional police powers."). Congress has not expanded the Forest Service's role to manage bison on the Gallatin National Forest beyond the responsibilities in the Forest Plan and applicable statutes to manage habitat, and the Forest Service thus does not "approve"—or, for that matter, reject—hunting configurations.[11]  Rather, Congress has decided that the baseline condition for National Forest System land is to remain open to hunting as part of the multiple-use scheme. The Forest Service is not required to analyze or explain that decision.

Plaintiffs also argue that, in issuing the closure order under 36 C.F.R. § 261.50(a) (2018) that established the Beattie Gulch Clean Zone, the Forest Service was required to explain its

---

[11] As discussed *supra*, the State of Montana regulates hunting under the traditional police power of the several states to manage animal populations within their borders.

decision to not close other parts of the Forest.  Pls.' Br. 19.  This argument fails for at least three

reasons.  First, it is an attempt to allege a "stand-alone" APA claim, and fails as a matter of law.

*See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 29 (D.D.C. 1999), *aff'd and remanded sub nom. Cobell*

*v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ("th[e] right to review of administrative action

[afforded by the APA] does not stand alone; persons seeking APA review must show some

independent statutory right to which they are entitled"); *Detroit Int'l Bridge Co. v. Gov't of*

*Canada*, 192 F. Supp. 3d 54, 78 (D.D.C. 2016), *aff'd*, 875 F.3d 1132 (D.C. Cir. 2017) ("When

deciding whether an agency action was arbitrary or capricious, courts must determine the scope

of the duty imposed on the agency by Congress in the relevant substantive statute.").  Plaintiffs

have not identified any statute allegedly violated by the Forest Service's implicit "decision" not

to close other areas of the Forest, or explained how that "decision" could be "arbitrary and

capricious" absent such authority.  At bottom, this argument thus presents nothing for the Court's

review.

Second, taken to its logical endpoint, Plaintiffs' theory would impose a duty on the Forest

to explain why any given closure does not extend to a larger area, or even to the entire forest.

Such a presumption would be contrary to the long-recognized principle that a decision not to

take an enforcement step is "generally committed to an agency's absolute discretion," *Heckler v.*

*Chaney*, 470 U.S. 821, 831 (1985), and thus not judicially reviewable.  Plaintiffs have not

identified any substantive statute providing the Forest Service with guidelines to follow in

deciding whether a closure should issue, and the statutes on which they do rely—e.g., 16 U.S.C.

§ 551 (requiring the Secretary of Agriculture to regulate the forests to prevent their destruction),

16 U.S.C. § 553 (requiring Forest Service officers to aid in state law enforcement efforts

regarding natural resources)—are "drawn so that a court would have no meaningful standard

against which to judge the agency's exercise of discretion" to issue or not issue a closure order. *Citizens for Responsibility & Ethics in Washington v. FERC*, 892 F.3d 434, 439 (D.C. Cir. 2018). Further, to the extent Congress has provided guidelines, those guidelines disfavor closure and require the Forest Service to limit closures to only "the smallest area for the least amount of time that is required."  16 U.S.C. § 7913(a)(2).

Third and finally, to the extent Plaintiffs arguments are construed as a claim of entitlement to agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1), Plaintiffs have no claim of right to a closure order.  Put simply, shooting closures are not the type of "legally *required*" agency action that may be compelled by courts.  *Norton v. So. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004); *accord Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 670 (D.C. Cir. 2016) (explaining that "§ 706(1) grants judicial review only if a federal agency has a 'ministerial or non-discretionary' duty amounting to 'a specific, unequivocal command.'" (quoting *Norton*, 542 U.S. at 63-64)).  Courts have recognized that closure orders of this type are not the sort of discrete, ministerial actions that may be compelled under § 706(1), and have likewise rejected attempts—similar to the case at bar—to advance time-barred § 706(2) claims under the guise of a "failure to act" claim.  *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 593 F.3d 923, 933-34 (9th Cir. 2010).

Plaintiffs' arguments regarding the Forest Service's legal authority to issue closures of National Forest System land to hunting fail to state a claim.  Consequently, Plaintiffs enjoy no likelihood of success on those arguments.

### B.  Plaintiffs Have No Likelihood of Success on their Argument that "The Park Service Can Control the Bison Hunting in Beattie Gulch," Let Alone that It Must.

Plaintiffs devote a considerable number of pages in their brief to recounting the history of the bison in the west, all in service to the facially implausible argument that the seven words

"sell or otherwise dispose of surplus buffalo" evince a congressional intent to usurp Montana's traditional police role over hunting within its borders and therefore require the Park Service to intervene.  These arguments fail.  The Park Service has consistently interpreted its jurisdiction over wildlife management to end at Yellowstone's borders, and that interpretation is entitled to deference.  Moreover, even if the Park Service *could* micromanage hunting outside Yellowstone, Plaintiffs have not identified any authority *requiring* it to do so, or even requiring it to consider doing so.  Finally, contrary to Plaintiffs' arguments, the National Park Service did thoroughly analyze the impacts of bison management—including hunting as a management tool—in the IBMP EIS, and Plaintiffs cannot challenge that analysis now.  Plaintiffs have no likelihood of success on these claims.

As discussed *supra*, although "Congress has traditionally allotted the authority to manage wildlife to the states," *Defs. of Wildlife*, 627 F.2d at 1248, "Congress may, if it wishes, pre-empt state management of wildlife on federal lands."  *Id.* (citing *Kleppe*, 426 U.S. at 539-41).  Through 16 U.S.C. § 36, Congress has chosen to override some state authority over the Yellowstone bison herd:

> The Secretary of the Interior is authorized, in his discretion and under regulations to be prescribed by him, to give surplus elk, buffalo, bear, beaver, and predatory animals inhabiting Yellowstone National Park to Federal, State, county, and municipal authorities for preserves, zoos, zoological gardens, and parks. He may sell or otherwise dispose of the surplus buffalo of the Yellowstone National Park herd, and all moneys received from the sale of any such surplus buffalo shall be deposited in the Treasury of the United States as miscellaneous receipts.

"Congress made this provision to shield the National Park Service from the economic burden of surplus Yellowstone bison and from the lack of available range for the surplus bison."  *W. Watersheds Project v. Salazar*, 766 F. Supp. 2d 1095, 1102 (D. Mont. 2011), *aff'd*, 494 F. App'x 740 (9th Cir. 2012).

The Park Service has chosen to exercise its authority to manage the Yellowstone herd through the IBMP, which "established a plan to adaptively manage Yellowstone bison as wild and free-ranging while also reducing the risk of transmission of brucellosis to Montana cattle." *W. Watersheds Project*, 494 F. App'x at 742.  "[T]he Park Service has discretion to manage the Yellowstone bison at levels that can be accommodated on the available range," id. (citing *Intertribal Bison Coop. v. Babbitt*, 25 F.Supp.2d 1135, 1138 (D.Mont.1998), *aff'd sub nom.*, *Greater Yellowstone Coal. v. Babbitt*, 175 F.3d 1149 (9th Cir.1999)), and has chosen to exercise that discretion, in part, by allowing limited state and tribal hunting of surplus bison.  See 2019 Winter Ops. Plan 6-7; IBMP EIS, 123-36 (discussing an alternative that would employ hunting outside the Park as the primary means of culling surplus bison); *Id*. at 177 (discussing preferred alternative employing "an adaptive management approach); *Id*. at 192-93 (discussing population management goal of keeping the number of bison around 3,000); December 1, 2011 Memorandum to File Discussing Adaptive Management Adjustments to IBMP 2-3, 5 (discussing adjustment to IBMP to "recognize tribal treaty rights for hunting bison" the impacts of which "are consistent with Alternative 3 of the FEIS and the environmental assessment completed by [Montana].").

The Park Service has consistently interpreted Congress' grant of jurisdiction over the bison to end at the park's boundaries, and that "[o]utside the park, in Montana, wildlife-management and wildlife-damage cases are supervised by the Montana Department of Fish, Wildlife and Parks."  IBMP EIS, 46; *accord Greater Yellowstone Coal. v. Babbitt*, 952 F. Supp. 1435, 1445 (D. Mont. 1996) (describing Park Service "written policy" as calling "for joint management of Yellowstone bison with the State of Montana . . . .").  Plaintiffs disagree, and so strain to construe "sell or otherwise dispose of surplus buffalo" as imposing an affirmative a duty

on the Park Service to manage the bison herd beyond the park's boundaries.  Pls.' Br. 22-26.  No

such grant of jurisdiction appears on the plain face of the statute, and this Court's inquiry should

go no further.  *See City of Arlington v. F.C.C.*, 569 U.S. 290, 296-97 (2013) (courts reviewing an

agency's construction of a grant of jurisdiction should first consider "whether Congress has

directly spoken" and, if so, "the court . . . must give effect to the unambiguously expressed intent

of Congress." (quoting *Chevron U.S.A. v. Nat. Res. Def. Council*, 467 U.S. 837, 842-43

(1984))).[12]

Even if the statute were ambiguous enough to support an inkling of Congress' intent to

abridge traditional state powers over wildlife—which, again, is not even hinted at on the face of

the statute—the next question in this Court's inquiry would be whether the Park Service's

interpretation "is based on a permissible construction of the statute."  *Id.* (quoting *Chevron*, 467

U.S. at 843).  And at the very least, the Park Service's interpretation is permissible.  Plaintiffs'

narrative regarding the history of the Yellowstone amendments goes nowhere; legislative history

should not be employed to introduce ambiguity into statutory language, *U.S. ex rel. Totten v.*

*Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004), and "courts have no authority to *enforce*

alleged principles gleaned *solely* from legislative history that has no statutory reference point."

*Int'l Bhd. of Elec. Workers, Local Union No. 474 v. N.L.R.B.*, 814 F.2d 697, 700 (D.C. Cir. 1987)

(citations omitted).

But even assuming *arguendo* that Plaintiffs are correct, and that the Park Service is

empowered to supplant Montana's traditional role by managing bison outside Yellowstone,

nothing in the statute imposes a duty on the Park Service to do so.  Section 36 authorizes the

---

[12] In challenging the Park Service's longstanding interpretation of its jurisdiction, Plaintiffs make
no mention of *City of Arlington*.

Secretary of the Interior to exercise "discretion" and states that the secretary "*may* sell or otherwise dispose of the surplus buffalo of the Yellowstone National Park herd" but that "all moneys received . . . *shall* be deposited in the Treasury of the United States . . . ."  16 U.S.C. § 36 (emphasis added).  "The traditional, commonly repeated rule is that *shall* is mandatory and *may* is permissive," *Anglers Conservation Network*, 809 F.3d at 671 (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112 (2012)), and "when a statutory provisions use both 'shall' and 'may,' it is a fair inference that the writers intended the ordinary distinction."  *Id.* (citations omitted).  The plain reading of the statute then, guided by the "traditional rule," is that Congress granted permissive authority to the Park Service to exercise whatever authority is granted by the phrase "sell or otherwise dispose of surplus buffalo."  Nothing imposes an obligation on the Park Service to exercise its authority to the fullest extent, and Plaintiffs concede this point.  Pls.' Br. 29.

Plaintiffs next attempt a sleight-of-hand, arguing that the "2019 Winter Plan . . . arbitrarily and capriciously implemented the Yellowstone Management Act Amendments and violated the APA" because the Park Service "has never considered using its authority beyond the Yellowstone boundary."  Pls.' Br. 28-29.  This argument lacks merit.  First and foremost, as described *supra*, the Park Service has no authority to manage beyond the park's boundaries.  But in any event, Plaintiffs' argument that the Park Service was required to consider possible authority extending beyond the boundaries of Yellowstone is untethered from any statutory mandate.  Nothing in § 36 requires the Park Service to consider *anything* in deciding how to "sell or otherwise dispose of surplus buffalo," and no regulations constrain the Park Service's discretion either.  Nor can Plaintiffs direct this court to any statute instructing the Park Service on what information to include in annual operations documents like the 2019 Winter Plan.  In

other words, the Park Service's choice of method to dispose of surplus buffalo is "committed to agency discretion by law and thus judicially unreviewable." *Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 718 F.3d 974, 977-76 (D.C. Cir. 2013) (citing *Heckler*, 470 U.S. at 830).

Of course, NEPA requires that agencies consider a reasonable range of alternatives when evaluating the impacts of a major federal action.  40 C.F.R. § 1502.14 (2018); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011).  But the 2019 Winter Plan is not a NEPA document nor a major federal action—it is a document implementing the IBMP as adopted through the IBMP ROD, the NEPA obligations for which were satisfied in the IBMP EIS.  As discussed *supra* and in more detail *infra*, any challenge to the sufficiency of the analysis in the IBMP EIS is long since time-barred.  Plaintiffs attempt to circumvent the statute of limitations by disguising their NEPA claims as a challenge to the 2019 Winter Plan is unavailing.

Plaintiffs' arguments regarding the Park Service's jurisdiction over bison outside of Yellowstone go nowhere; nothing on the face of the statute suggests that Congress intended to expand the Park Service's geographical jurisdiction through allowing the Secretary of the Interior to "sell or otherwise dispose of surplus buffalo," and to the extent there is any ambiguity on that question, the agency's construction is at the very least permissible.  Further, Plaintiffs cannot challenge the adequacy of the analysis in the IBMP EIS nearly twenty years after that analysis was completed.  Plaintiffs have no likelihood of success on these theories.

### C.  The Agencies Analyzed the Impacts of Bison Management in the IBMP EIS, and Plaintiffs' Challenge to that Analysis is Time Barred

Plaintiffs argue that NEPA required the agencies to analyze adaptive management decisions implementing the IBMP as "connected actions" in a new EIS, and that their failure to

do so constitutes improper segmentation. Pls.' Br. 29-30. This argument is another attempt to challenge the sufficiency of the analysis in the IBMP EIS, and is foreclosed under the six-year statute of limitations for APA claims. Further, Plaintiffs' segmentation claim fails because the agency *did* consider all aspects of bison management in the single IBMP EIS. Because any challenge to the IBMP EIS is time barred, this Court lacks jurisdiction over these claims, and consequently Plaintiffs have no likelihood of success.

In the IBMP EIS, the agencies thoroughly analyzed the impacts of bison management on the environment. As relevant here, that analysis included the impacts of hunting as a management tool to implement the IBMP. *See, e.g.*, IBMP EIS, 123-36 (discussing the "Hunting Alternative"); *id.* at 134-35 (discussing how the State would manage hunting in a similar manner to other big game species, that hunting regulations would be strictly enforced, but that "[l]icensed hunters would not be otherwise restricted or assisted by agency personnel."). Subsequent management actions and adaptive management decisions are not new actions requiring a new NEPA analysis; they are implementations of the action discussed in the IBMP EIS and approved in the IBMP ROD. *See Mayo v Reynolds*, 875 F.3d 11, 20-21 (D.C. Cir. 2017) (holding that the Park Service was not required to perform a new NEPA analysis for each action implementing the Jackson Elk Herd Plan); s*ee also, e.g.*, December 1, 2011 Memo; State of Montana Final Bison Hunting Environmental Assessment II ("Hunting was not included in the early phases of the management plan, but it was not precluded, and the Final EIS (National Park Service 2000) included an intensive analysis of hunting that implied that hunting could be adopted as a management tool when conditions were appropriate.").

Plaintiffs argue that, because the IBMP is a major federal action, "NEPA requires [the agencies] to analyze all direct, indirect, and cumulative impacts of the bison management plan."

25

Pls.' Br. 32.  Plaintiffs are correct, but late to the game; the agencies reached that conclusion

years ago, and so included an extensive analysis of the direct, indirect, and cumulative impacts of

the IBMP in the EIS.  *See, e.g.*, IBMP EIS, 375-440 (discussing impacts to the bison population

for each alternative); *id.* at 611-17 (discussing impacts to human health for each alternative); *id.*

at 634-55 (discussing impacts to visual resources for each alternative).  The six-year statute of

limitations for any challenge to the sufficiency of the IBMP's analysis "beg[an] to run when the

right of action first accrue[d], which is the date of the final agency action."  *Chenault*, 968 F.

Supp. at 272 (citations omitted).  The last signature on the ROD is dated December 20, 2000,

almost nineteen years ago.  IBMP ROD, 46.  Plaintiffs' challenge to the agencies' analysis

plainly falls outside of the statute of limitations.

On reply, Plaintiffs may argue that the agency has re-opened the IBMP EIS through

subsequent implementation documents.  Those argument should be rejected.  The Circuit Court

has explained that "[t]he reopening doctrine allows an otherwise stale challenge to proceed

because the agency opened the issue up anew, and then reexamined . . . and reaffirmed its [prior]

decision."  *Nat'l Resources Def. Council v. EPA*, 571 F.3d 1245, 1265 (D.C. Cir. 2009) (quoting

*P & V Enters. v. U.S. Army Corps of Eng'rs*, 516 F.3d 1021, 1023-24 (D.C. Cir. 2008)) (internal

quotation marks omitted).  And this Court has cautioned that "[f]or this doctrine to apply,

however, the agency must have, in light of 'the entire context,' 'undertaken a serious, substantive

reconsideration of the [existing] rule.'"  *Chenault*, 968 F. Supp. 2d at 272 (quoting *P & V*

*Enters.*, 516 F.3d at 1023-1024); *accord Sendra Corp. v. Magaw*, 111 F.3d 162, 167 (D.C. Cir.

1997) (reopening doctrine may apply where an agency makes a clear statement that it is

reconsidering an issue (citing *Morris v. Sullivan*, 897 F.2d 553, 558 (D.C. Cir. 1990))).  The

annual Winter Operations Plans do not purport to reconsider the IBMP or the analysis in the

IBMP EIS.  *Contra* 2019 Winter Ops. Plan 2 ("This document outlines the actions necessary to

implement the Interagency Bison Management Plan (IBMP) as set forth in the general and state

Records of Decision signed in 2000 and modified by adaptive management adjustments since

2005.").  Nor did the 2011 adaptive management changes, which first recognized public and

treaty hunting rights.[13]  And no other circumstances suggest the agencies were reconsidering the

decisions in the IBMP.  In sum, Plaintiffs' challenges to the analysis in the IBMP EIS are

foreclosed by the statute of limitations, which has not been re-opened by subsequent agency

actions implementing the IBMP.

Plaintiffs' segmentation claim similarly lacks merit.  CEQ regulations governing scoping

in the NEPA process require agencies to consider whether there are any "[c]onnected actions,

which means that they are closely related and therefore should be discussed in the same impact

statement."  40 C.F.R. § 1508.25(a)(1) (2018).  "An agency impermissibly 'segments' NEPA

review when it divides connected, cumulative, or similar federal actions into separate projects

and thereby fails to address the true scope and impact of the activities that should be under

consideration."  *Mashack v. Jewell*, 149 F. Supp. 3d 11, 31 (D.D.C. 2016) (quoting *Del.*

*Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2004)).

Here, the agencies did not segment their analysis to avoid revealing the significance of

the approved actions, but instead considered all of the actions related to bison management under

the IBMP in a single EIS.  That included coordinating with other IBMP members to use state and

tribal hunting as one management tool (among several) in controlling the size of the Yellowstone

herd.  Further, while Montana has since engaged in additional environmental analysis to satisfy

---

[13] Even if the 2011 Memo comes closer to reopening the conclusions in the IBMP EIS,
publication of that document nearly eight years ago is still too far in the past to be of any help to
Plaintiffs.  *See* December 1, 2011 Memo.

its obligations under the Montana Environmental Policy Act, See Mont. Final Bison Hunting EA (2004), no federal action is necessary to approve or facilitate hunting on State of Montana or National Forest System lands. *See* IBMP EIS, 44 (discussing each agency's responsibilities and jurisdiction); Reid Decl. ¶ 4 ("The National Park Service does not have the authority to authorize, permit or manage any aspect of hunting, or the land base on which it occurs, outside the boundaries of the park."); Erickson Decl. ¶ 4 ("NFS lands are generally open to hunting and recreational shooting. The Forest Service has no authority to authorize or regulate hunting on NFS lands."). Plaintiffs suggest that the federal agencies can control bison hunting "with their purse strings," Pls.' Br. 33, and thus were required to engage in NEPA analysis of Montana's hunting practices. Plaintiffs are wrong; no federal funds support state or tribal hunting beyond normal forest expenditures to aid the State of Montana in enforcing state laws on National Forest System land, as authorized under 16 U.S.C. §§ 551a, 553. *See* Reid Decl. ¶ 4; Erickson Decl. ¶ 4.

Plaintiffs' challenge to the IBMP EIS is untimely, and no subsequent action by the agencies has re-opened the statute of limitations for the IBMP EIS. Similarly, the agencies did not improperly segment bison management into multiple decisions, but analyzed all the actions that compromise bison management in the IBMP EIS. And in any event, no major federal action approves or implements hunting, which is regulated by the state and tribal entities. Plaintiffs have no likelihood of success on these claims.

### A. There Are No Significant Changes to the IBMP or Significant New Circumstances Requiring a Supplemental EIS

Finally, Plaintiffs argue that bison hunting at Beattie Gulch is either a "substantial change" to the actions analyzed in the IBMP EIS or else a "significant new circumstance" so as to require analysis in a Supplemental Environmental Impact Statement ("SEIS"). Pls.' Br. 34-

36; *see also* 40 C.F.R. § 1502.9(c)(1) (2018).  Neither is correct.  Hunting as a bison

management tool was extensively considered in the IBMP EIS, and the preferred alternative

specifically called for adaptive management changes—including the possibility of implementing

state hunting as a population management tool—when the circumstances permitted.  And

hunting in Beattie Gulch is not a new circumstance; National Forest System land is generally

open to hunting.  Plaintiffs are not likely to succeed on this claim.

CEQ regulations implementing NEPA require agencies to prepare supplements to EISes

in two scenarios.  First, agencies are required to conduct supplemental analyses where they

"make[] substantial changes in the proposed action that are relevant to environmental concerns."

40 C.F.R. § 1502.9(c)(1)(i).  Not all changes require new analysis; agencies are only required to

supplement where changes "cause effects which are significantly different from those already

studied."  *Mayo v. Jarvis*, 177 F. Supp. 3d 91, 117 (D.D.C. 2016) (quoting *Davis v. Latschar*,

202 F.3d 359, 369 (D.C. Cir. 2000)); *In re Operation of Mo. River System Litg.*, 516 F.3d 688,

693 (8th Cir. 2008) ("A substantial change that requires an SEIS . . . is one that is *not*

'qualitatively within the spectrum of alternatives that were discussed' in a prior FEIS." (quoting

*Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1292 (1st Cir. 1996))).  An agency "is not

required to repeat its analysis simply because the agency makes subsequent discretionary choices

in implementing the program."  *Mayo v Reynolds*, 875 F.3d 11, 20-21 (D.C. Cir. 2017).

Second, agencies must supplement their analysis where "[t]here are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impact."  40 C.F.R. § 1502.9(c)(1)(ii).  This duty to supplement is guided by a "rule

of reason" under which "an agency need not supplement an EIS every time new information

comes to light after the EIS is finalized."  *Mayo*, 875 F.3d at 16 (quoting *Marsh v. Or. Natl. Res.*

*Council*, 490 U.S. 360, 373 (1989)).  Instead, a "supplemental EIS is only required where new

information provides a *seriously* different picture of the environmental landscape."  *Natl. Comm*

*for the New River v. FERC*, 373 F.3d 1323, 1330 (D.C. Cir. 2004) (quoting *City of Olmstead*

*Falls v. FAA*, 292 F.3d 261, 274 (D.C. Cir. 2002)) (internal quotation marks omitted).

 Neither requirement for supplementation is implicated here.  Once again, hunting—

presumptively available at any time on National Forest System lands, subject to reasonable

regulation—was fully analyzed in the IBMP EIS as a management tool for controlling bison

numbers, and was thus "within the spectrum of alternatives that were discussed" in the IBMP

EIS.  *In re Operation of Missouri River System Litg.*, 516 F.3d at 693 (citation omitted); *see also*

IBMP EIS, 123-36 (discussing hunting alternative).  Among other impacts, that discussion

analyzed impacts to the bison population itself (IBMP EIS, 401-05), to recreational interests (*Id.*

at 445-46), to human health (*Id.* at 613-14 (discussing risk of brucellosis transmission to

hunters)), and to visual resources in the area.  *Id.* at 637-38 ("Hunters and hunting activities

might be visible within viewsheds of surrounding areas.  This would be a short-term impact

through the winter hunting season and a minor impact in the viewshed because most viewers

would not readily see these activities.  However, to some viewers sensitive to killing of bison,

this would be a major impact.").[14]  To the extent Plaintiffs' claims challenge the adequacy of that

---

[14] Here again, Plaintiffs misrepresent the agency's statement in the ROD as deferring
analysis of hunting until later.  Pls.' Br. 34-35 (characterizing IBMP ROD 15).  This is wrong
and impossible to square with substantial attention given to hunting in the EIS.  Once again, what
the ROD actually says is "[t]he state FEIS does recognize that additional compliance with the
Montana Environmental Quality Act may be required.  Until the federal agencies review actual
bison hunting proposals, we cannot opine as to the necessity of additional NEPA compliance to
implement a public hunt as part of the Joint Management Plan."  IBMP ROD 15.  Later, after
reviewing Montana's environmental assessment of hunting, the agencies concluded that "[t]he
impacts of public and treaty hunts on Yellowstone bison are consistent with Alternative 3 of the
FEIS . . . ."  December 1 2011 Memo 5.

analysis, for all the reasons discussed *supra*, that challenge is foreclosed by the statute of limitations.

Nor has any significant new information come to light.  Again, National Forest System land is generally open to hunting, and so hunting is not a new circumstance.  Specifically, hunting on the Gallatin National Forest is not new; hunting is a major recreational use on the Gallatin National Forest, IBMP EIS, 294-95, and National Forest System lands "are generally open to hunting and recreational shooting."  Erickson Decl. ¶ 4.  Nor is bison hunting new; hunting is a "traditional use of bison by humans," IBMP EIS, xlv-xlvi, bison hunts were held in Montana in the mid-1980s through early 1990s, IBMP EIS, 303, and bison hunts have been going on again since 2005.  The IBMP EIS documents how the bison itself is an important cultural resource for American Indian tribes in the Yellowstone area.  IBMP EIS, 328, 363.  Plaintiffs aver that the agencies never analyzed the danger to human life posed by hunting generally and brucellosis specifically.  This is also wrong—the agencies explicitly considered both.  IBMP EIS, 135 (explaining that the state will "strictly" enforce its hunting regulations and that "[h]unters would be notified of the health risks and appropriate precautions for handling dead bison."); IBMP EIS, 360-61 (discussing risk of brucellosis transmission to humans from hunting).

The plaintiff in *Mayo v. Reynolds* advanced theories similar to those Plaintiffs advance here, attempting to "fault[] the Park Service for not preparing a NEPA analysis each year during the fifteen-year term of the 2007 [Jackson Elk Herd Plan]."  *Mayo*, 875 F.3d at 22.  The Circuit Court rejected the plaintiff's arguments, holding that "[t]he Park Service's mere implementation of the 2007 Plan, without more, did not result in any '*seriously* different picture of the environmental landscape."  *Id.* (quoting *Nat'l Comm. For the New River*, 373 F.3d at 1330).

There, as here, "the Park Service published a thorough and detailed EIS." *Id.* at 21.  And there, as here, the plaintiff could not identify a "material change causing unforeseen environmental consequences" that would require a supplemental analysis. *Id.* at 21.

The agencies have not strayed beyond the bounds of the IBMP EIS' analysis, nor are there any significant new circumstances that require additional analysis.  Plaintiffs have no likelihood of success on their duty to supplement claims.

## III.    Plaintiffs Fail to Show Irreparable Harm

Plaintiffs have failed to demonstrate an irreparable harm to their interests in the absence of a preliminary injunction.  Plaintiffs alleged injuries are highly speculative, but even if sufficient for standing—which appears at least doubtful—"[a] prospective injury that is sufficient to establish standing . . . does not necessarily satisfy the more demanding burden of demonstrating irreparable injury.  The D.C. Circuit 'has set a high standard for irreparable injury.'" *Cal. Ass'n of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("[A] plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it.").

Plaintiffs must make two showings to demonstrate irreparable harm sufficient to justify emergency relief. *Nat'l Fair Housing All. v. Carson*, 330 F.Supp.3d 14, 62–63 (D.D.C. 2018). "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminent that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters*, 838 F.3d at 7-8 (quoting *Chaplaincy*, 454 F.3d at 297).  Second, Plaintiffs must show that the harm is "beyond remediation." *Carson*, 330 F.Supp.3d 14, 62–63 (D.D.C. 2018)

(quoting *League of Women Voters*, 838 F.3d at 8.).  "As with the likelihood of success on the merits prong, . . . plaintiff[s] bear[] the burden of showing that [they] will suffer irreparable injury."  *See Sierra Club v. U.S. Dept. of Energy*, 825 F. Supp. 2d 142, 152 (D.D.C. 2011) (citing *Winter*, 555 U.S. at 22).

Plaintiffs allege four theories of irreparable injury from the ongoing state-authorized hunt: an increased risk to their physical health and safety; economic injuries related to loss of real property value and rental income; aesthetic injury from viewing bison hunting; and procedural harms.  ECF No. 4-1, 41.  Each of Plaintiffs' alleged injuries is speculative, and none warrants emergency relief.

### A.  Plaintiffs' Alleged "Increased-Risk-of-Harm" Injuries are Uncertain, Theoretical, and Fail to Show a Clear and Present Need for Equitable Relief.

### i.  Plaintiffs' Alleged "Increased-Risk-of-Harm" Injuries are Insubstantial and Improbable.

Plaintiffs allege two injuries may result from an increased risk to their safety from the annual bison hunt.  First, Plaintiffs assert an increased risk of being injured—*i.e.*, an accidental shooting—as a result of the bison hunt.  ECF 4-1 at 42-43.  Second, Plaintiffs fear that the hunted bison may be infected with brucellosis, that infectious remains could be carried off National Forest System land and onto Plaintiffs' parcels by carrion birds, that Plaintiffs could come into contact with those infectious remains, and that Plaintiffs could thus contract undulant fever.  *Id.* at 38-39.  Neither harm is "likely."

Even in cases alleging an "increased-risk-of-harm," injury must be actual or imminent.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914–21 (D.C. Cir. 2015) (citing *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir.2006)).  In "increased-risk-of-harm" cases, the plaintiff must show "*both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm

with that increase taken into account." *Food & Water Watch*, 808 F.3d at 914–21 (emphasis added); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. at 414). "Disputes about future events where the possibility of harm to any given individual is remote and speculative" do not demonstrate the requisite "injury in fact," *Food & Water Watch*, 808 F.3d at 914–21, and mere "allegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotations omitted) (emphasis added). Because Plaintiffs' allegations of health and safety harm fall below that required to establish constitutional standing, they are *a fortiori* insufficient to meet Plaintiffs' burden to show imminent irreparable harm. *Cal. Ass'n of Private Postsecondary Schools*, 344 F. Supp. 3d at 170 (injury-in-fact threshold is lower than that for irreparable harm).

Plaintiffs' claims that the bison hunt increases their risk of harm from gunshot injuries or the transmission of brucellosis are extremely speculative. Plaintiffs offer no evidence to support their premise that the hunt is dangerous for non-hunters or that any increase in the number of bison killed increases the facially implausible risk of being the accidental victim of a gunshot away from National Forest System land. ECF 4-1, 17. Instead, Plaintiffs cite examples of the State of Montana discussing risks to participants in the hunt that do not even mention neighboring parcels. Pls.' Br. Ex. V (Errata), ECF 4-19; Pls.' Br. Ex. C, ECF 4-11. And Plaintiffs make no mention of the steps Montana and the tribal entities have taken steps to *reduce* those risks. *2019 Winter Plan* 6-7 (discussing how, ahead of the 2017-18 season, tribal and state hunters "signed a Memorandum of Agreement for coordinating bison harvest in the Beattie Gulch area near Gardiner, Montana, including common hunt protocols, safety provisions, regulations, and enforcement."). Instead, Ms. Lynn offers limited and conclusory allegations to support her assertion that the hunt will be substantially more dangerous in the 2019-2020 hunting

season than in years past.  ECF 4-1 at 18-19.  Plaintiffs make no effort to grapple with the fact

that, though hunting is to some extent an inherently dangerous activity, the agencies, hunting

tribes, and the other IBMP partners have been working together for years to promote safe

hunting practices.  *See, e.g.*, Tribal MOA, Erikson Decl. ¶ 5.[15]  And, of course, Plaintiffs are not

hunters, and have no right to assert third-party injuries.

      Plaintiffs' fears of the transmission of brucellosis is even more speculative.  Nothing in

Plaintiffs' Complaint or the corresponding declarations establishes that the potential increase in

the number of bison killed during the hunt increases the risk of brucellosis transmission.  Nor do

Plaintiffs allege that anyone has ever contracted brucellosis as a result of bison hunting at Beattie

Gulch.  In fact, Plaintiffs' expert, Dr. Peter Nara, confirms that any risk from bison hunting at

Beattie Gulch is presently unknown.  ECF No. 4-45, 8.  Additionally, as Plaintiffs concede, not

all bison have brucellosis.  ECF No. 4-1.  Plaintiffs' argument is based solely on alleged and

unsupported speculation and an attenuated chain of hypothetical events; Plaintiffs assume (1)

that the number of bison killed will increase, despite the State's ability to regulate both the

number of hunters and allowable kills; (2) that the bison killed will have brucellosis; and (3) that

Plaintiffs will come into contact with those contaminated remains.  Plaintiffs cannot, in the

absence of any factual support, simply construct a worst-case scenario to justify the relief sought

in this instance.  Mere speculation simply is not enough to show a "substantial increase in risk of

harm." *See Food & Water Watch, Inc.*, 808 F.3d at 914–21.

---

[15] Plaintiffs also allege that they "heard some hunters hunting bison at night or after dark[,] ECF 4-27, 10, and saw "a tribal warden's signal lights as he raced to where a shooter was firing at other people," ECF 4-36, 3, they are in increased danger.  Shooting at private residences, at other people, or at night would be a violation of the hunting permits and Montana safety regulations. *See* Tribal MOA; Montana Hunting Regs.  These unsubstantiated allegations of regulatory non-compliance are not sufficient to establish standing, much less irreparable harm.

But Plaintiffs brucellosis theory is more attenuated still; Plaintiffs' Complaint is devoid of any allegation that there is a "substantial probability" that they personally are likely to contract brucellosis.  Instead, Ms. Lynn offers little more beyond an anecdote that she once encountered a woman, living in a tepee near her cabins, covered in blood while "making purses out of the bison stomachs."  ECF 4-27, 11-12.  Ms. Lynn acknowledges that she does not know if this woman contracted undulant fever.  *Id.*  Even taken as true, this anecdote is meaningless here—Plaintiffs do not allege that the woman was injured, that she is a member of Plaintiffs' organization, or that any injury encountered as a result of voluntary contact with bison remains is fairly traceable to Defendants.  These allegations fall far short of showing a direct harm.  *Winter*, 555 U.S. at 22, 129 S.Ct. 365.[16]

### ii.    Plaintiffs' Alleged Aesthetic Injuries Do Not Establish a Clear and Present Need for Equitable Relief

Plaintiffs have failed to allege a continuous and ongoing harm to their ability to observe bison that meets the rigorous standard for showing irreparable harm.  Ms. Lynn contends that she suffers aesthetic harms from no longer "seeing the bison roaming freely as they did from 2006 to 2011."  ECF 4-27, 17.  The Yellowstone bison herd remains free roaming, and Ms. Lynn does not expand on why she can no longer take pictures of the bison.  As stated above, bison may not be hunted within Yellowstone National Park; nothing prevents Ms. Lynn from observing the bison on nearby Park Service land free from the fear of encountering bison hunting.

---

[16] Plaintiffs make the unfortunate decision to analogize their situation to those of the Guantanamo detainees in *Al-Joudi v. Bush*.  406 F. Supp. 2d 13, 20 (D.D.C. 2005).  There, petitioners alleged that fellow detainees were allegedly force fed through nasogastric tubes without any sedative, which caused them to vomit substantial amounts of blood.  *Id.* at 17.  Plaintiffs suggestion that they are faced with he "same irreparable injury with even more force" than the *Al-Joudi* petitioners notwithstanding, ECF 4-1, 42, that case has nothing to do with one at bar.

Additionally, neither Ms. Lynn, nor any other individual, enjoys an exclusive and

unfettered right to bison on the Gallatin National Forest.  Forest System lands are managed under

the principle of multiple use, and hunting is a permissible use. 16 U.S.C. § 528; *see also* 16

U.S.C. § 7913(a)(2).

Plaintiffs' allegations of increased risk of physical and aesthetic injury fail to meet the

irreparable harm threshold because they are uncertain, theoretical, and not "so imminent that

there is a clear and present need for equitable relief." *See Carson*, 330 F.Supp.3d at 63.

### iii.    Plaintiffs' Alleged Economic Harms are not "Beyond Remediation"

Plaintiffs' final alleged injury—economic harm—is not "beyond remediation" and thus

also fails to meet the irreparable harm threshold.  *See League of Women Voters,* 838 F.3d at 7-8.

"The standard for showing irreparable harm in this jurisdiction is strict, and economic harm

alone is generally not sufficient to warrant this Court's granting of a motion for a preliminary

injunction."  *Safari Club Intern. v. Salazar*, 852 F.Supp.2d 102, 120 (D.D.C. 2012); *see also*

*Wisconsin Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) ("economic loss does not, in

and of itself, constitute irreparable harm.")  "Recoverable monetary loss may

constitute irreparable harm only where the loss threatens the very existence of the movant's

business."  *Wisc. Gas Co.,* 758 F.2d at 674 (citing *Wash. Metro. Area Tran. Comm'n v. Holiday*

*Tours, Inc.,* 559 F.2d 841, 843 n. 2 (D.C.Cir.1977)).

Ms. Lynn claims that she suffered economic harm because her property value has

declined.[17]  ECF 4-1, 27 ¶ 52.  Though Ms. Lynn argues the existence of her business is at stake

because she "*almost* had to sell one rental cabin," *See* ECF 4-1 at 40, 42, she does not include

any corroborating evidence.  Further, Ms. Lynn has "not shown that a temporary injunction

---

[17] Pure economic harm also falls squarely outside of NEPA's zone of interests.  *See ANR Pipeline Co. v. FERC*, 205 F.3d 403, 408 (D.C. Cir. 2000).

would stop or reverse the [alleged] drop in the value of [her property] that has already taken place." *Salazar*, 852 F.Supp.2d at 120.   Thus, to the extent Plaintiffs present Ms. Lynn's economic harm claims as an irreparable economic harm argument, "these arguments do not suffice to warrant the extraordinary remedy of injunctive relief." *See id.*

Plaintiffs' claims of injury[18] are entirely speculative and do not rise to the level of cognizable injuries in fact caused by Defendants' conduct, much less the "higher threshold of irreparable harm" required to succeed on a motion for a preliminary injunction. *See League of Women Voters*, 838 F.3d at 7.   Plaintiffs are not entitled to the remedy they seek.

### IV.   Plaintiffs' delay counsels against a finding of irreparable harm.

For reasons known only to them, Plaintiffs waited roughly ten months to file this action after the 2019 Winter Operating Plan was published.  *See* 2019 Winter Plan 1 (noting the plan was approved on December 31, 2018).   Delay in filing a preliminary injunction supports a conclusion that the plaintiff cannot satisfy the irreparable harm prong.  *See Fund For Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one.").   Indeed, "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Open Top Sightseeing USA*, 48 F. Supp. 3d at 90 (citation omitted).  This Court and the United States Court of Appeals for the District of Columbia have underscored plaintiffs' delay when denying motions for a preliminary injunction. In *Fund for Animals*, for example, the D.C. Circuit Court of Appeals reasoned that its decision to

---

[18] Similarly, Plaintiffs have failed to articulate an irreparable harm related to their NEPA claim that is likely to occur in the absence of a preliminary injunction.  A bare procedural defect is insufficient to support standing, much less irreparable harm.  *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009); *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.C. Cir. 2003).

deny the plaintiffs' motion for preliminary injunction was "bolstered" by the plaintiffs' 44-day

delay in bringing suit.  *Fund for Animals v. Frizzell*, 530 F.2d 982, 987-88 (D.C. Cir. 1975).  The

Court stated that the delay was "inexcusable."  *Id.* at 987.

Plaintiffs' claims against the 2019 Winter Operations Plan ripened when that document

was published on December 31, 2018.  As discussed *supra*, many aspects of Plaintiffs' challenge

are so stale as to be time-barred, and Plaintiffs concede that they have raised their objections

regarding the hunt "[f]or years . . . at regular IBMP meetings."  Plaintiffs offer no explanation as

to how these issues have suddenly become an emergency, nor do they provide any basis for their

delay, which has pressed the parties and this Court into an eleventh-hour, emergency posture.

This unexcused delay is strong evidence "that any alleged harm lacks the urgency and

immediacy required to grant the extraordinary relief the plaintiffs[] request."  *Open Top*

*Sightseeing*, 48 F. Supp. 3d at 91.  This Court should decline Plaintiffs' late-arriving request to

disrupt the status quo on the eve of the State hunting season, especially in light of the substantial

public and government interests discussed below.

**V.     The Balance of Equities and Public Interest Counsel Against an Injunction**

In considering the extraordinary remedy of a preliminary injunction, "courts must balance

the competing claims of injury and must consider the effect on each party of the granting or

withholding of the requested relief."  *Winter*, 555 U.S. at 24 (internal quotations and citations

omitted).  And, "[i]n exercising their sound discretion, courts of equity should pay particular

regard for the public consequences" that would issue from an injunction.  *Weinberger v. Romero-*

*Barcelo*, 456 U.S. 305, 312 (1982). Where, as here, an injunction is sought against the

government, these inquiries largely merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs have not met their burden to show that the balance of harms favors an injunction or that emergency relief is in the public interest.  As discussed *supra*, Plaintiffs' alleged health and safety harms are highly speculative and uncertain; indeed, Plaintiffs come forward with no evidence showing that anyone has ever contracted undulant fever or been otherwise injured by bison hunting.[19]  In contrast, the harms to tribal and state hunters from Plaintiffs' requested relief are certain.  An injunction ordering the Forest Service to close off hunting opportunities would immediately deprive tribal hunters of "aboriginal rights to hunt bison on certain federal (USFS, BLM) and state lands in the Yellowstone area of Montana under treaties with the U.S. Government."  December 1, 2011 Memo 5.  As discussed in the IBMP EIS, for many tribes, "[b]ison are a link to the spiritual world," IBMP EIS, 328, and Appendix I to the EIS summarizes comments received from tribes regarding the importance of bison during the IBMP planning process.  *Id.* at 772-95 (discussing historic treaty hunting rights and other interests in bison management from American Indian tribes and tribal organizations in the Yellowstone area).[20]  Court-ordered closure would also harm the interests of state hunters, especially in light of the limited opportunities for big game hunting recognized in the Gallatin Forest Plan.  Gallatin National Forest Plan III-71; V-9, 14.[21]

---

[19] And while the State of Montana has recognized and sought to cure safety concerns associated with the hunt, those efforts only mention risks to hunters, not Plaintiffs.  Cf. January 27, 2017 Hunting Regulations Memo (implementing Montana statutory and regulatory hunting safety authorities); September 21, 2018 Letter (requesting public review and comment on a proposed state hunting closure in the Beattie Gulch area).

[20] Indeed, the intersection of federal land management and the exercise of tribal treaty rights is a complex, legal issue, *see, e.g.*, *Herrera v. Wyoming*, 139 S. Ct. 1686, 1693 (2019), which counsels against disrupting the status quo through a preliminary injunction.  Especially so where, as here, the only emergency is of Plaintiffs' own making.

[21] Plaintiffs dismissively refer to all hunting in the area as "recreation," Pls.' Br. 45, because Plaintiffs make no effort to distinguish between the tribal hunting rights—which account for the majority of bison hunting in the area—and the much smaller number of state hunting permits.  *See* Doc. 4-31 MFWP closure notice 3.

Plaintiffs' requested remedy also implicates the Forest Service's strong interests in preserving its fundamental management prerogatives and discretion, including the ability to cooperate with state wildlife agencies and their hunting regimes.  *See* 36 C.F.R. Part 241. Plaintiffs overtly challenge the well-established cooperative federalism scheme that governs wildlife management on National Forest System Lands, Pls.' Br. 18 (citing Martin Nie et al., *Fish and Wildlife Management on Federal Lands: Debunking State Supremacy*, 47 Envtl. L. 797, 857-58 (2017)), and the remedy they request would injure the federal government's relationship with the other sovereigns in the area by upending the collaborative management decisions made by the IBMP members.  A preliminary injunction would also abridge the Park Service's statutory discretion to "sell or otherwise dispose of surplus buffalo," 16 U.S.C. § 36, and frustrate Congress' plain intent to invest that authority in the Park Service alone.

Contrary to Plaintiffs' argument that the agencies and the public will suffer "little, if any" harm from preliminary relief, there are substantial federal, state, tribal, and local interests implicated.  All counsel strongly against an injunction.  This Court should deny Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, and also for those stated in Defendants' motion to transfer

venue, this Court should either deny Plaintiffs' motion for a preliminary injunction or else

transfer this entire case—including Plaintiffs' request for preliminary relief—to the District of

Montana.


Respectfully submitted this 31st day of October, 2019,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tele: (202) 305-0238
Fax: (202) 305-0506
tyler.alexander@usdoj.gov

*/s/ Jennifer A. Najjar*
JENNIFER A. NAJJAR
Trial Attorney
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
Tele: (202) 305-0476
Fax: (202) 305-0506
emma.hamilton@usdoj.gov
*Attorneys for Defendants*

*/s/ Emma L. Hamilton*
EMMA L. HAMILTON
Trial Attorney
Natural Resources Section
P.O. Box 7611

Washington, D.C. 20044-7611
Tele: (202) 305-0479
Fax: (202) 305-0506
emma.hamilton@usdoj.gov
*Attorneys for Defendants*