Brian D. Upton
John T. Harrison, *pro hac vice*
CSKT Legal Department
36100 2nd St. East
P.O. Box 278
Pablo, MT 59855
(406) 675-2700, ext. 1165
Brian.Upton@cskt.org
John.Harrison@cskt.org
*Attorneys for Amicus Curiae*
*Confederated Salish and Kootenai Tribes*


Michael A. Lopez, *pro hac vice*
Nez Perce Tribe
Office of Legal Counsel
P.O. Box 305
100 Agency Rd
Lapwai, ID 83540
(208) 843-7355
Facsimile: (208) 843-7377
mlopez@nezperce.org
*Attorney for Amicus Curiae Nez Perce Tribe*


Joseph R. Pitt, *pro hac vice*
Office of Legal Counsel
Confederated Tribes of the Umatilla Indian Reservation
46411 Timine Way
Pendleton, OR 97801
Telephone and Facsimile: (541) 429-7404
joepitt@ctuir.org
*Attorney for Amicus Curiae*
*Confederated Tribes of the Umatilla Indian Reservation*


Ethan Jones
ethan@yakamanation-olc.org
Yakama Nation Office of Legal Counsel
P.O. Box 150
Toppenish, WA 98948-0150
(509) 865-7268
Facsimile: (509) 865-4713
*Attorney for Amicus Curiae*
*Confederated Tribes and Bands of the Yakama Nation*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NEIGHBORS AGAINST BISON
SLAUGHTER, *et al.*, and Bonnie Lynn,

      Plaintiffs,

         v.

THE NATIONAL PARK SERVICE, *et al.*,

      Defendants.

Case No. 01:19-cv-3144-BAH

**BRIEF OF *AMICI CURIAE* IN
SUPPORT OF FEDERAL
DEFENDANTS' CORRECTED
OPPOSITION TO PLAINTIFFS'
MOTION FOR A TEMPORARY
RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

**Introduction** ...................................................................................................................1

**Interest of the Amici** ......................................................................................................2

Confederated Salish and Kootenai Tribes ......................................................................2

Nez Perce Tribe ...............................................................................................................4

Confederated Tribes of the Umatilla Indian Reservation................................................6

Confederated Tribes and Bands of the Yakama Nation ..................................................8

**Argument** ......................................................................................................................**10**

*Amici* Tribes will be substantially injured by an injunction given the importance of the treaty hunt to *Amici* Tribes and its members ...................................................................11

The balance of equities overwhelmingly favors denying Plaintiffs an injunction because of the substantial efforts that the *Amici* Tribes have devoted to ensuring the safety of the hunt .........13

Enjoining the bison hunt is contrary to the public interests in upholding tribal sovereignty and the exercise of Treaty rights .............................................................................................15

**Conclusion** ....................................................................................................................**16**

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama,*
    742 F.3d 1023 (D.C. Cir. 2014) ................................................................ 10
*Campo Band of Mission Indians v. United States,*
    2000 U.S. Dist. LEXIS 7269, *30 (D.D.C. 2000) ................................... 19
*CityFed Fin. Corp. v. Office of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995) ............................................................. 10, 14
*Confederated Tribes of the Umatilla Indian Reservation v. Maison,*
    262 F. Supp. 871 (D. Or. 1966) .................................................................. 1
*Holcomb v. Confederated Tribes of Umatilla Ind. Reservation,*
    382 F.2d 1013 (9th Cir. 1967) ..................................................................... 1
*Parravano v. Babbitt,*
    70 F.3d 539 (9th Cir. 1995) ....................................................................... 15
*Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel Thompson,*
    874 F.2d 709 (10th Cir. 1989) ................................................................... 14
*State v. Arthur,*
    261 P.2d 135 (1953) ..................................................................................... 1
*State v. Stasso,*
    172 Mont. 242 (1977) ................................................................................... 2
*United States v. State of Wash.,*
    384 F. Supp. 312 (W.D. Wash. 1974) ......................................................... 8
*Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah,*
    790 F.3d 1000 (10th Cir. 2015) ................................................................. 14
*Washington State Dep't of Licensing v. Cougar Den, Inc.,*
    139 S. Ct. 1000 (2019) ............................................................................ 8, 9
*Winter v. Nat, Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................... 10
*Yakama Indian Nation v. Flores,*
    955 F. Supp. 1229 (E.D. Wash. 1997) ........................................................ 8

## Statutes

25 U.S.C. § 5123 ............................................................................................. 2
United States Constitution art. VI .................................................................. 16

## Other Authorities

Treaty with the Flathead, Kootenay, and Upper Pend d'Oreilles Indians
    12 Stat. 975, 976 (July 16, 1855) ........................................................... 1, 3

Treaty with the Nez Perces
  12 Stat. 957 (June 11, 1855) ................................................................................................1, 5
Treaty with the Yakamas
  12 Stat. 951 (1855).....................................................................................................................1
Treaty with the Walla-Walla, Cayuse, and Umatilla Tribes and Bands of Indians in Washington
and Oregon Territories
  12 Stat. 945 (June 9, 1855) ...................................................................................................1, 7

# I.   INTRODUCTION

*Amici Curiae* Confederated Salish and Kootenai Tribes of the Flathead Reservation

("CSKT"), Nez Perce Tribe, Confederated Tribes and Bands of the Yakama Nation ("Yakama

Nation"), and the Confederated Tribes of the Umatilla Indian Reservation ("CTUIR")

(collectively, "*Amici* Tribes") are federally-recognized Indian tribes in the Inland Northwest,

each of which is a signatory or political successor in interest for those tribes and bands that

entered into several distinct treaties with the United States in 1855, commonly referred to as the

"Stevens Treaties".[1] *Amici* Tribes ceded vast amounts of their territories to the United States

while reserving, among other guarantees, their rights to continue hunting outside their Treaty-

created reservations on "unclaimed" or "open and unclaimed lands".[2] Today, *Amici* Tribes

continue to exercise their Treaty-reserved hunting rights on open and unclaimed lands, including

an annual subsistence bison hunt in the Beattie Gulch area on Custer-Gallatin National Forest

lands ("National Forest") adjacent to Yellowstone National Park in the present-day state of

Montana.[3] Consistent with their historical practices, *Amici* Tribes also manage and co-manage

---

[1] Treaty with the Flathead, Kootenay, and Upper Pend d'Oreilles Indians, art. III, 12 Stat. 975, 976 (July 16, 1855) ("Hellgate Treaty"); Treaty with the Nez Perces, art. III, 12 Stat. 957, 958 (June 11, 1855) ("1855 Treaty"); Treaty with the Yakamas, art. III, 12 Stat. 951, 952 (1855) ("Treaty with the Yakamas); Treaty with the Walla-Walla, Cayuse, and Umatilla Tribes and Bands of Indians in Washington and Oregon Territories, art. I, 12 Stat. 945, 946 (June 9, 1855).

[2] *Id*.

[3] Federal and state courts have long recognized National Forests as subject to reserved Indian treaty hunting rights. *See e.g., State v. Arthur*, 261 P.2d 135 (1953), *cert. denied*, 347 U.S. 937 (1954)(interpreting treaty language reserving the Nez Perce Tribe's right to hunt on "open and unclaimed land" as expressly encompassing National Forest land); *Confederated Tribes of the Umatilla Indian Reservation v. Maison*, 262 F. Supp. 871, 873 (D. Or. 1966), *aff'd sub nom, Holcomb v. Confederated Tribes of Umatilla Ind. Reservation,* 382 F.2d 1013 (9th Cir. 1967)(interpreting treaty language reserved the CTUIR's right to hunt on "unclaimed" land included National Forest land); *State v. Stasso*, 172 Mont. 242, 245, 248 (1977)(interpreting treaty language reserving the CSKT's right to hunt on "open and unclaimed land" as encompassing National Forest lands).

their resources with their federal and state counterparts and assume the responsibilities that accompany their Treaty-reserved rights through tribal hunting regulations and other mechanisms.

Amici Tribes write separately to emphasize: (1) the continuing significance of Treaty-reserved bison hunting, especially in the Beattie Gulch area on National Forest lands; and (2) Plaintiffs' request for an injunction and/or temporary restraining order should be denied because the balance of equities, avoiding substantial harm to the *Amici* Tribes, and the public interest weighs overwhelmingly in favor of honoring *Amici* Tribes' Treaty-reserved hunting rights.

This Court granted leave to file this brief pursuant to an Order issued November 1, 2019 and file in support of the Federal Defendants' brief in Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction ("Federal Defendants' Brief") Doc 25.[4]

## II.    INTEREST OF THE *AMICI*[5]

### 1.  *Confederated Salish and Kootenai Tribes*

The CSKT is a federally recognized tribe organized pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 5123. The CSKT is a confederation of the Bitterroot Salish, Kootenai, and Pend d'Oreilles Tribes. Their aboriginal territory includes what is now western Montana and parts of present day Wyoming, Idaho, and British Columbia. The CSKT is governed by a ten-member Tribal Council acting under the Constitution and By-Laws of the Confederated Salish and Kootenai Tribes. Article III of the Hellgate Treaty reserves to the CSKT

---

[4] On November 1, 2019, Federal Defendants filed with this Court a Corrected Opposition to Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction, Doc 27-1. Amici Tribes will therefore instead refer to this brief as "Federal Defendants' Brief").

[5] The parties to this case have consented to the filing of this *Amicus Curiae* brief. Pursuant to LCvR 7(o) (5) and 26.1, Amici Tribes represent that no party to this case nor their counsel authored this brief in whole or in part and that no person other than Amici Tribes paid for or made a monetary contribution toward the preparation and submission of this brief.

the right to hunt off the Flathead Reservation on "open and unclaimed land" in "usual and accustomed places" throughout their aboriginal territory.[6]

In 2007, the CSKT re-initiated its traditional bison hunt pursuant to off-reservation bison hunt regulations approved annually by the CSKT Tribal Council. Tribal members who wish to engage in the hunt are required to attend an annual bison hunt orientation. The CSKT regulations and orientation materials are available on the internet in order to assist potential tribal hunters and inform the general public and others who may be interested in how the CSKT conducts its bison hunt.[7] The CSKT bison hunt orientation website provides a wealth of information regarding the CSKT cultural connection to the bison, and the current management regime for Yellowstone bison, along with hunt maps and regulations Tribal members will need for their bison hunt. The CSKT consider the Yellowstone bison hunt a subsistence hunt and part of maintaining CSKT cultural traditions and lifeways.[8] The CSKT bison hunt season runs from September 1 through the end of January of each winter season.[9] As an Interagency Bison Management Program ("IBMP") member and a sovereign managing a bison hunt, the CSKT have a significant interest in the outcome of any litigation that could harm hunting opportunities for CSKT tribal members on the limited National Forest land available for bison hunting, particularly since the 2019-20 CSKT bison hunt season has already begun.

---

[6] *See,* fn 1, *supra.*
[7] *See,* https://csktbisonhunt.org.
[8] *See,* https://csktbisonhunt.org/Orientation.
[9] *See,* https://csktbisonhunt.org/RegsMapsUpdates/.

### 2. *Nez Perce Tribe*

The Nez Perce Tribe is a federally-recognized Indian tribe with headquarters on the Nez Perce Reservation in Lapwai, Idaho. The Nez Perce people, the *Nimiipuu*, exclusively occupied, since time immemorial, thirteen million acres encompassing a large part of what is today Idaho, Oregon, and Washington—stretching from the Bitterroot Mountains to the Blue Mountains. Nez Perce also traveled far beyond this homeland to fish, hunt, gather, and pasture—frequently going east to what is today the state of Montana, and west along the Snake and Columbia rivers to the Pacific Ocean. Nez Perce actively maintain their connection to the land, water, and resources of their vast homeland. Seasonal rounds and migration patterns for cultural and subsistence uses are carefully coordinated to take full advantage of fish, wildlife, and root crops. These annual cycles correspond not only to the unique resource needs of the Nez Perce and the seasonal availability of their resources but also to the ceremonial activities and social gatherings that occur throughout the year. The Nez Perce's intimate knowledge and continuous use of their homeland over millennia has created a unique and reverential bond between people and place that defines Nez Perce culture and identity.

Among the principal species the Nez Perce Tribe have and continue to hunt is bison. Bison are a culturally-significant animal to the Nez Perce people and are an important food in the traditional Nez Perce diet. Historically, the Nez Perce would make the long journey east on the Lolo Trail across the Bitterroot Mountains in what is now Montana. There, the Nez Perce hunted bison with the CSKT, CTUIR, and Yakama Nation, sometimes staying for years at a time.

When the Nez Perce Tribe entered into a treaty with the United States in 1855, it sought to reserve the rights central to maintaining its culture and way of life. The 1855 Treaty reserved

to the Tribe, for its "exclusive use and benefit," 7.5 million acres of its more than thirteen-million-acre homeland, including an area spanning present-day north-central Idaho, southeast Washington, and northeast Oregon, as well as the right to continue hunting outside the Treaty-created reservation "on open and unclaimed land".[10]

In the minutes of the 1855 Treaty negotiations at what is now Walla Walla, Washington, Governor Isaac Stevens, the principal negotiator for the United States, expressly assured the Nez Perce leaders that the Nez Perce Tribe can kill game and go to the bison when they please on any lands not occupied by white settlers. Governor Stevens made this promise to Chief Looking Glass, one of the principal Nez Perce chiefs.[11]

In 2006, the Nez Perce Tribe re-initiated its treaty bison hunt in the Greater Yellowstone Area with the support of the state of Montana. Since then, the Nez Perce Tribe has established an annual Treaty bison hunt, harvesting bison that naturally migrate out of Yellowstone National Park and onto adjacent National Forest lands, including Beattie Gulch.

In 2009, the Nez Perce Tribe joined the IBMP as a full voting partner. The Nez Perce Tribe requested a seat on the IBMP so that the Nez Perce Tribe's Treaty-reserved rights and cultural interests in bison are properly considered in any decisions or recommendations the IBMP makes regarding bison management in the Greater Yellowstone Area.

Since the Nez Perce Tribe re-initiated its Treaty bison hunt, Nez Perce Tribal members have travelled hundreds of miles to exercise their Treaty-reserved right to hunt bison on National Forest System lands in the Greater Yellowstone Area, including at Beattie Gulch. Nez Perce

---

[10] *See,* fn 1, *supra.*
[11] *The Official Proceedings of the Council in the Walla Walla Valley* (1855).

5

Tribal members hunt bison for subsistence, spiritual, and cultural reasons–not for recreation. The Nez Perce Tribe's governing body, the Nez Perce Tribal Executive Committee, in consultation with the Nez Perce Tribe's Fish and Wildlife Commission, promulgate bison hunting regulations each year prior to authorizing a Treaty bison hunt. The Nez Perce Tribe's annual bison hunt generally runs from November through March and its regulations are publicly online.[12] The Nez Perce Tribe's regulations provide, among other requirements, that Nez Perce Tribal members obtain a permit and attend a mandatory pre-hunt orientation session. To further ensure a safe and responsible hunt, the Nez Perce Tribe's regulations also require that its Conservation Enforcement Officers be present in the field whenever a Nez Perce Tribal member is participating in the Treaty bison hunt.

The Nez Perce Tribe views the annual Treaty bison hunt on the Custer-Gallatin National Forest, including Beattie Gulch, as a practice critical to maintaining the health, nutrition, culture, traditions, and lifeways of its members. The Nez Perce Tribe therefore has a significant interest in the outcome of any litigation that may restrict or otherwise negatively affect the exercise of its Treaty-reserved bison hunting rights now or in the future.

### 3.   *Confederated Tribes of the Umatilla Indian Reservation*

The CTUIR is a federally-recognized Indian tribe with its homeland and governmental offices located on the Umatilla Indian Reservation in northeast Oregon. The CTUIR is a confederation of three tribes – the Umatilla, Cayuse, and Walla Walla – that entered into the 1855 Treaty of Walla Walla with the United States (12 Stat. 945). Article I of the CTUIR's

---

[12] *See,* https://www.nezperce.org//wp-content/uploads/2018/09/REGULATIONS-2018-19-Treaty-Buffalo-Hunt_Preliminary-Date-Changes-for-2018-19-Season.pdf (last visited November 4, 2019).

Treaty reserved for its members the right to hunt on unclaimed lands outside of the boundary of the Umatilla Indian Reservation.[13] Washington Territorial Governor Isaac I. Stevens, the lead treaty negotiator for the United States, represented clearly to the tribal negotiators that the Treaty would secure a continued right for members of the CTUIR to hunt bison in the Greater Yellowstone Area, stating "…we want you to have your roots and to get your berries, and to kill your game; we want you if you wish to mount your horses and go off to the buffalo plains…"[14] Due to a variety of factors, including the decline of wild bison populations on unclaimed lands, the CTUIR's members were unable to exercise their Treaty right to harvest bison for a lengthy period post-Treaty.

The CTUIR began discussions with the state of Montana regarding reinitiating the exercise of its Treaty right to harvest bison in 2008 and the CTUIR's Fish and Wildlife Commission issued regulations opening a Treaty bison hunting season in 2010. Members of the CTUIR have engaged in hunting in the Beattie Gulch area in Gardiner, Montana each winter since 2010. The CTUIR's members hunt bison communally for subsistence and cultural needs – it is not a recreational or a trophy hunt. The CTUIR's 2019-2020 bison season runs from December 1, 2019 to February 28, 2020 and its regulations are publicly online.[15] The CTUIR's regulations require hunters to obtain a permit, to hunt in parties of at least four individuals, and to attend mandatory pre-hunt orientation sessions focused on appropriate hunting practices and

---

[13] "[T]he privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens, is also secured to them." Treaty between the Cayuse, Umatilla, and Walla Walla Tribes, in Confederation, and the United States, June 9, 1855 (12 Stat. 945).

[14] *See,* A True Copy of the Record of the Official Proceedings at the Council in the Walla Walla Valley, held jointly by Isaac I. Stevens Gov. & Supt. Indian Affairs O.T. on the part of the United States with the Tribes of Indians named in the Treaties made at that Council June 9th and 11th 1855, at page 12.

[15]*See,* https://ctuir.org/sites/default/files/HUNTING%20REGS%202019-20%20july%2011.pdf (last visited November 4, 2019).

safety measures. The Treaty bison hunt is of extreme cultural significance to the CTUIR and it has a significant interest in the outcome of any litigation that could impede or impact the exercise of its Treaty bison hunting rights now or in the future.

### 4. *Confederated Tribes and Bands of the Yakama Nation*

The Yakama Nation is a sovereign Native Nation federally recognized under the Treaty with the Yakamas. The Yakama Nation possesses inherent sovereignty, the scope of which extends to Treaty-reserved rights in its historic ancestral domains, i.e., those ceded and aboriginal lands where their ancestors fished, hunted, gathered roots, berries and medicines, pastured livestock, and engaged in trade. The tribal treaty negotiators knew that securing these off-reservation rights was crucial to guaranteeing the vitality of their culture and traditions as well as the livelihood of their future generations.

Article III of the Treaty with the Yakamas reserved to the Yakama people the right to maintain their traditional way of life within their ancestral domains, reserving the right of "hunting, gathering roots and berries, and pasturing their horses upon open and unclaimed lands". 12 Stat. 951, 953. The tribal treaty negotiators would have understood this provision to include the right to hunt *ts'uulam* – bison or buffalo – and therefore the Treaty with the Yakamas must be interpreted as such. *See Yakama Indian Nation v. Flores*, 955 F. Supp. 1229, 1238-39, 1262-63 (E.D. Wash. 1997), *aff'd sub nom. Cree v. Flores*, 157 F.3d 762 (9th Cir. 1998); *see also Washington State Dep't of Licensing v. Cougar Den, Inc.*, 139 S. Ct. 1000, 1012, 1017 (2019). Since time immemorial, the fourteen original, free, and independent Native Nations that were later confederated as the Yakama Nation hunted *ts'uulam*, over their ancestral domains, including what is now Montana and Wyoming. *See Cougar Den, Inc.*, 139 S. Ct. at 1017 (citing

*Yakama Indian Nation* 955 F. Supp. at 1262. This essential aspect of the Yakama peoples'
traditional way of life was so critical that the subject of *ts'uulam* and the unrestricted ability to
travel to the Plains and harvest *ts'uulam* was repeatedly broached during the 1855 treaty
negotiations at the Walla Walla Treaty Council. *See Yakama Indian Nation*, 955 F. Supp. at
1243-44. In this way, Article III secured a solemn promise that "the Yak[a]mas would forever be
able to continue the same off-reservation food gathering [] practices as to time, place, method,
species and extent as they had or were exercising". *United States v. State of Wash.*, 384 F. Supp.
312, 380-81 (W.D. Wash. 1974), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975); *see also*
*Cougar Den, Inc.*, 139 S. Ct. at 1012.

Article III of the Treaty with the Yakamas preserves a culture that relies on access to, and
the responsible use of, the Creator's gifts of water, fish, game, roots, and berries. When the
settlement of the Western United States caused the near extinction of *ts'uulam*, the Yakama
Nation took it upon itself to take appropriate action and suspended its traditional hunt of
*ts'uulam* until wild herd populations reached levels that could once again sustain the exercise of
annual hunts. Despite this, the Yakama Nation preserved its cultural connection with *ts'uulam* by
introducing and managing a healthy herd of the animal on the Yakama Reservation and by
participating in the Inter-Tribal Buffalo Council.

In 2017, the Yakama Nation resumed exercise of its Treaty right to hunt *ts'uulam* for the
first time in more than a century by sending a delegation of elected officials to participate in a
ceremonial hunt in Beattie Gulch. Since then, the Yakama Nation has implemented a robust
regulatory program to ensure that the exercise of this right, in Beattie Gulch and elsewhere, is
done is a safe and respectful manner. The Yakama Nation's Fish and Wildlife Committee

9

reviews and adopts regulations each year to supplement the Yakama Nation's Wildlife Code and govern the hunt. Yakama members may only hunt *ts'uulam* during a designated season between the first Friday in December and the last Friday in February. Any member participating in the hunt must receive a permit and attend an orientation organized by the Yakama Nation's Wildlife, Range & Vegetation Resources Management Program , Game Wardens, and Office of Legal Counsel. The orientation materials, along with the 2019-2020 hunting regulations, are available online.[16]  During the hunt, Yakama members are prohibited from discharging firearms unless at a reasonably safe distance from roadways, structures, and persons.[17] Yakama Nation Game Wardens, who accompany members during the hunt, are authorized to stop hunts to address any safety concerns.[18] These regulatory mechanisms are meant to protect Yakama members, other hunters, and community members who reside near the hunting area.

The Yakama Nation's *ts'uulam* hunt is not a recreational activity. Instead, it is an exercise of a sacred and Treaty-reserved right by a sovereign nation. The Yakama Nation has already authorized a hunt for the 2019 to 2020 season. As such, the Yakama Nation has a significant interest in any proceedings that threaten to impact or affect its Treaty-reserved hunting activities, including those in Beattie Gulch.

### III.    ARGUMENT

A plaintiff seeking a preliminary injunction must make a "clear showing" that he or she is likely to succeed on the merits; that he or she will suffer irreparable harm in the absence of preliminary

---

[16] *See,* https://www.ynwildlife.org/
pdf/Blodgett_Yakama%20Nation%20Tsoothlum%20(Bison)%20Hunt%20Orientation%20v1_DB.pdf (last visited November 4, 2019).
[17] Yakama 2019-2020 Bison Hunting Regulations, 2.
[18] Revised Yakama Code, § 32.122.01.

relief; that the "balance of equities" tips in his or her favor; and that an injunction would serve the public interest. *Winter v. Nat, Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008); *accord Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). To prevail, the plaintiff must also demonstrate "than an injunction would not substantially injure other interested parties." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) (internal citation omitted).

### *1. Amici Tribes will be substantially injured by an injunction given the importance of the treaty hunt to Amici Tribes and its members.*

As Federal Defendants correctly observe in their Brief, tribal hunters – not Plaintiffs – will be substantially injured if this Court grants the extraordinary remedy of enjoining the tribal Treaty hunt in Beattie Gulch. Federal Defendants' Brief, 27-1 at 44. As a preliminary matter, *Amici* Tribes are not parties to this case, yet Plaintiffs' injunction request expressly targets an end to the tribal Treaty hunt in Beattie Gulch. Plaintiffs also never provided any notice to *Amici* Tribes before filing their lawsuit, even though Plaintiff Lynn has attended several IBMP meetings and is or should be well aware of *Amici* Tribes' participation in the IBMP and significant interest in managing their annual Treaty bison hunt.

Moreover, the harm to *Amici* Tribes will be substantial and irreparable. *Amici* Tribes have engaged in bison hunting in the Greater Yellowstone Ecosystem since time immemorial. *Amici* Tribes have deep and enduring ties to bison that are fundamentally rooted in each Tribe's unique culture, identity, and traditions.  *Amici* Tribes accordingly hunt bison for subsistence and cultural purposes, not for recreation and certainly "do not scramble for a prize" as asserted by Plaintiffs. Plaintiffs' Brief, Doc. 4-1 at 6.  Their members travel hundreds of miles each year for the

opportunity to exercise their Treaty rights and harvest a bison as their ancestors did. To tribal members, the hunt provides a healthy and sustainable source of food and clothing for family members and an opportunity to re-establish cultural and spiritual connections to a majestic animal that at one time was intentionally destroyed as a military and political expedient, resulting in the near-extirpation of the species and devastating trauma to *Amici* Tribes.

Furthermore, as Federal Defendants and Plaintiffs correctly note, tribal Treaty hunting opportunities are geographically limited. *Amici* Tribes' Treaty bison hunt is currently limited to public lands, including National Forest lands adjacent to Yellowstone National Park. Tribal Treaty hunters do not hunt bison within the boundaries of Yellowstone National Park or on private property outside of the Park. A primary corridor for the bison migrating north of Yellowstone Park is on National Forest land through Beattie Gulch, which is why Beattie Gulch is where the majority of the *Amici* Tribes' harvest has occurred and is anticipated to occur in the near future. Plaintiffs' Exhibit C, Doc 4-11 at 1 (September 21, 2018 Letter from Montana Fish, Wildlife, and Parks to Interested Person).

An injunction against hunting in Beattie Gulch would inevitably impact the exercise of already limited Treaty hunting rights, which is a cultural activity that provides much needed sustenance for tribal members. This would result in substantial injury to *Amici* Tribes and their interests. Accordingly, the Court should deny Plaintiff's request for injunction.

**2. The balance of equities overwhelmingly favors denying Plaintiffs an injunction because of the substantial efforts that the Amici Tribes have devoted to ensuring the safety of the hunt.**

It is important to note that an injunction ordering the Forest Service to enjoin tribal Treaty hunting opportunities at Beattie Gulch would be particularly inappropriate given that neither the Forest Service nor other Federal Defendants authorizes or enforces *Amici* Tribes' Treaty hunt. That sovereign authority is vested in *Amici* Tribes, who promulgate their own laws and regulations governing the Treaty hunt for their members and enforce them. In exercising this authority, *Amici* Tribes have devoted substantial resources and efforts to prioritizing safety and ensuring a responsible Treaty hunt.

*Amici* Tribes have also been willing partners in addressing Beattie Gulch bison hunt safety and continue to work with state and federal agencies as well as the Gardiner community. As the Forest Service began modifying the land open to hunting in Beattie Gulch, *Amici* Tribes voluntarily complied, and did not challenge the Forest Service's action to enlarge the no-shooting zone despite the resulting reduction of an already limited hunt area. *See,* Docs 25-6, 25-7, 25-8 (current Forest Service no shooting zones).

Furthermore, *Amici* Tribes recognized in 2017 that an increasing number of bison hunters in Beattie Gulch, coupled with the increasingly limited hunt area, necessitated additional safety measures. Accordingly, *Amici* Tribes committed to developing a collective Memorandum of Agreement ("MOA") to establish a joint framework for how *Amici* Tribes would manage their respective hunters in the Beattie Gulch area. The MOA is discussed in the Federal Defendants' Brief, Doc 27-1 and attached as Exhibit 2, Doc 25-2. After the execution of the MOA, *Amici*

13

Tribes participated in a public meeting in Gardiner to discuss the Treaty hunt and explain the MOA to the Gardiner community.[19]

The MOA has a number of safety protocols, including a common set of regulations for hunters in Beattie Gulch. Doc 25-2. Key elements of the MOA include a significantly reduced number of hunters allowed in the Beattie Gulch area during a hunting period, mandatory no-shoot restrictions during bison retrieval, and a requirement that tribal law enforcement be present any time *Amici* Tribes have hunters in Beattie Gulch. Doc 25-2. *Amici* Tribes each determine how to incorporate the increased safety features of the MOA into their respective bison hunt regulations.[20]

Consistent with the MOA's prioritization of safety, *Amici* Tribes maintain communication with the Gardiner community on issues surrounding Beattie Gulch and the Tribal bison hunt. The April 2019 IBMP meetings devoted an extended amount of time to meeting with Gardiner residents to discuss improving safety of the north side bison hunt, including a full field day with Gardiner community leaders from the Bear Creek Council.[21] A follow up discussion with the Bear Creek Council members was held at the July IBMP meeting.[22] Issues of intergovernmental coordination regarding hunt safety and the public is a regular discussion at the annual bison hunt managers meeting each spring. *See, e.g. Id.*, p.3 (IBMP agenda item for report from May 16, 2019 hunt managers meeting in Missoula, Montana).

---

[19] *See,* https://visitgardinermt.com/images/docs/newsletters/20171011.pdf (published announcement by CSKT for a community meeting with the tribes before the 2017-18 hunting season).

[20] *See,* e.g. https://csktbisonhunt.org/RegsMapsUpdates/ (describing Beattie Gulch Special Permit Hunt Area for CSKT hunters).

[21] *See,* ibmp.info/Library/20190425/IBMP_2019Apr25_MeetingSummary_FINAL.pdf.

[22] *See,* ibmp.info/Library/20190731/IBMP_2019Jul31_MeetingSummary_DRAFT_ver19862.pdf.

Plaintiffs' requested injunction fails to acknowledge the significant measures *Amici* Tribes have taken to address bison hunt safety in Beattie Gulch, and their efforts at ongoing communication with the Gardiner community. The balance of equities tips steeply in favor of the Court denying the injunction.

### 3. Enjoining the bison hunt is contrary to the public interest in upholding tribal sovereignty and the exercise of Treaty rights.

There is a "paramount federal policy" toward ensuring that the development of "strong tribal governments" is free from interference. *Seneca-Cayuga Tribe of Oklahoma v. State of Okl. ex rel Thompson*, 874 F.2d 709, 716 (10th Cir. 1989). As such, protecting tribal sovereignty is in the public interest. *See Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 790 F.3d 1000, 1007 (10th Cir. 2015). Treaties, which are the "supreme Law of the Land,"[23] serve as formal acknowledgements of tribal sovereignty. By extension, then, protecting the exercise of tribal Treaty rights and the federal promises made therein is likewise in the public interest. This is consistent with the federal government's trust responsibility to Indian tribes. *See Parravano v. Babbitt*, 70 F.3d 539, 547 (9th Cir. 1995) (stating that, pursuant to the trust obligation, "the tribes' federally reserved fishing rights are accompanied by a corresponding duty on the part of the government to preserve those rights."). Indeed, this Court has noted that "[o]bviously, it is in the public interest to honor any governmental obligations to the Indian Tribes." *Campo Band of Mission Indians v. United States*, 2000 U.S. Dist. LEXIS 7269, *30 (D.D.C. 2000) (finding that a tribe failed to demonstrate that the federal government had assumed a fiduciary duty in the disposition of excess U.S. Navy property).

---

[23] United States Constitution art. VI.

*Amici* Tribes' sovereign acts of developing and implementing bison hunting programs, including certain regulatory efforts specific to Beattie Gulch, constitute an exercise of self-government. The protection of this exercise is within the public interest and consistent with federal policy. Similarly, the protection of the federal promises to *Amici* Tribes' of their right to hunt bison, as formalized in *Amici* Tribes' respective Treaties, is in the public interest. Here, Plaintiffs do not and cannot offer the Court any evidence why the balance of harms tips in favor of speculative, indirect harm to an adjacent property owner, and against *Amici* Tribes' constitutionally-preserved, pre-existing and lawful exercise of treaty rights. Thus, the Court should reject Plaintiffs' request for an injunction, thereby favoring the public interest in the protection of tribal sovereignty and Treaty rights.

## IV.   CONCLUSION

For the foregoing reasons, *Amici* Tribes respectfully request that this Court deny Plaintiffs' motion for a preliminary injunction.

Respectfully submitted this 4th day of November, 2019.

/s/ Brian D. Upton
Brian D. Upton
/s/John T. Harrison
John T. Harrison, *pro hac vice*
Attorneys for Confederated
Salish and Kootenai Tribes
CSKT Legal Department
36100 2nd St. East
P.O. Box 278
Pablo, MT 59855
(406) 675-2700, ext. 1165
Brian.Upton@cskt.org
John.Harrison@cskt.org

16

/s/Michael A. Lopez
Michael A. Lopez, *pro hac vice*
Nez Perce Tribe
Office of Legal Counsel
P.O. Box 305
100 Agency Rd
Lapwai, ID 83540
(208) 843-7355
Facsimile: (208) 843-7377
mlopez@nezperce.org
*Attorney for Nez Perce Tribe*

/s/ Joseph R. Pitt
Joseph R. Pitt, *pro hac vice*
Office of Legal Counsel
Confederated Tribes of the Umatilla Indian
Reservation
46411 Timine Way
Pendleton, OR 97801
Telephone and Facsimile: (541) 429-7404
joepitt@ctuir.org
*Attorney for Confederated Tribes of the Umatilla
Indian Reservation*

/s/ Ethan Jones
Ethan Jones (WA46911)
ethan@yakamanation-olc.org
Yakama Nation Office of Legal Counsel
P.O. Box 150
Toppenish, WA 98948-0150
(509) 865-7268
Facsimile: (509) 865-4713

17

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of November, 2019, I electronically filed the foregoing

**BRIEF OF *AMICI CURIAE* IN SUPPORT OF FEDERAL DEFENDANTS' CORRECTED**

**OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING**

**ORDER AND PRELIMINARY INJUNCTION** with the Clerk of the Court using the CM/ECF

system which will send notification of this filing to all registered participants as identified in the

Notice of Electronic Filing.


*/s/ John T. Harrison*
John T. Harrison, *Pro Hac Vice*
*Attorney for Amicus Curiae*
*Confederated Salish and Kootenai Tribes*